IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

FREDERICK LIVINGSTON, an individual,  :  **Civil Action No.: 2:08-CV-00812**
                                      :
            Plaintiff,                :
                                      :
    vs.                               :
                                      :
THE BOROUGH OF EDGEWOOD, et al.,      :
                                      :
            Defendants.               :  **A JURY TRIAL DEMANDED**

FREDERICK LIVINGSTON, an individual,  :  **Civil Action No.: 2:09-CV00681**
                                      :
            Plaintiff                 :
                                      :
    vs.                               :
                                      :
THE BOROUGH OF EDGEWOOD, et al.,      :
                                      :
            Defendants.               :  **A JURY TRIAL DEMANDED**

**PLAINTIFF'S RESPONSE TO THE CONCISE STATEMENT OF FACTS**
**OF DEFENDANTS BOROUGH OF EDGEWOOD, DENNIS HOCKENBERRY,**
**MICHAEL CROW, KURT FERGUSON, AND PAUL WOOD**

AND NOW appears Plaintiff, Frederick Livingston, by and through his counsel, John R. Orie, Jr., Esquire, and files the within Response to the Concise Statement of Facts of Defendants Borough of Edgewood ("Edgewood"), Dennis Hockenberry ("Hockenberry"), Michael Crow ("Crow"), Kurt Ferguson ("Ferguson") and Paul Wood ("Wood") (collectively, "Defendants"), incorporating by reference his Response to the Concise Statement of Facts filed by Defendant Timothy Quinn ("Quinn"), his Response to the Motion for Summary Judgment filed by Defendant Quinn and his Memorandum of Law filed in opposition to said Motion as though the same were fully set forth herein, and setting forth in support of his Response the following:

1. Admitted.

2. Admitted insofar as Plaintiff was arrested on the charges of Rape, Statutory Sexual Assault, Sexual Assault, Incest, Endangering the Welfare of Children, Aggravated Indecent Assault, Indecent Assault and Corruption of Minors.   However, Allegheny County Detectives filed a criminal complaint and an Affidavit of Probable Cause charging Plaintiff. Plaintiff's Complaint does not set forth that the allegations were made by the daughter.

3. Admitted. By way of further response, however, Plaintiff was suspended without pay following a hearing held allegedly pursuant to **Cleveland Board of Education v. Loudermill**, 470 U.S. 52, 105 S. Ct. 1487 (1985). Complaint, Par. No. 16; Deposition of Paul Wood ("Wood") ("D.W."), pp. 55, 58.   The relevant Paragraphs of Plaintiff's Complaint is attached to this Response and marked as Plaintiff's Exhibit No. "1". The relevant excerpts of Defendant Wood's Deposition are attached to this Response and marked as Plaintiff's Exhibit No. "2".

4. The Confidence in Law Enforcement Act ("CLEA"), 53 P.S. §752.1 *et seq.*, and, in particular, Section 752.4 thereof is relied upon by Defendants to support their position that Defendant Edgewood's suspension of Plaintiff was mandated by CLEA and that, therefore, Defendant Wood's decision to suspend Plaintiff without pay following the said **Loudermill** hearing did not amount to an adverse employment act underpinned by racial animus or did not serve to create a hostile work environment for Plaintiff. However, Section 752.4 does not speak of or impose the requirement of suspension **without pay**. The text of Section 752.4 of CLEA is attached to this Response and marked as Plaintiff's Exhibit No. "3". Consequently, the act of Defendants Edgewood and Wood suspending Plaintiff without pay following the alleged **Loudermill** hearing gives rise to a genuine issue of material fact in dispute as to the motivation of Defendants Edgewood and Wood in this regard, especially in light of the alleged reluctance of the Council and the Mayor to concur with Plaintiff's suspension **without pay**. *See* Response to Par. No. 3, above.   Moreover, Defendants took the position that Plaintiff would not be retained following his trial even if acquitted. Additionally, Plaintiff in August 2009 was denied the right to

the assistance of counsel and a court reporter at his *Loudermill* hearing, whereas previously, Chief Messina was permitted the assistance of counsel and a court reporter.

5-7. The investigation done by Defendant Wood does not undercut or vitiate his recommendation and Defendant Edgewood's decision to suspend Plaintiff **without pay** following the *Loudermill* hearing, as nothing in Section 752.4 of CLEA requires this. As such, Defendants Wood's and Edgewood's decision to suspend Plaintiff **without pay**, even though Section 752.4 of CLEA does not mandate it, raises a genuine issue of material fact whether their motivation in this regard was underpinned by all Defendants' desire to create a racially hostile work environment for Plaintiff. Additionally, no exit interviews were given for African American employees, although white employees were given such interviews, and when Plaintiff was hired he was receiving Two Dollars ($2.00) per hour less than was Jason Haberman, a white officer. *See also* Response to Paragraph Nos. 3 and 4, above.

8. Page 150 of Defendants' Exhibit "A" is a recitation by Counsel for Defendants of the Minutes of the Meeting of Defendant Edgewood's Council regarding Plaintiff's suspension without pay upon Defendant Wood's recommendation. Counsel then asked Plaintiff if he had seen the certified letter of February 14, 2006, regarding notice of his suspension without pay. This would give rise to a genuine issue of material fact in dispute as to the motivation of Defendants Edgewood and Wood in their decision to suspend Plaintiff without pay, especially since Council and Davin wanted to continue Plaintiff's suspension with pay because they wished to support Plaintiff. D.W., at 56. By way of further answer, Plaintiff refers this Honorable Court to his Response to Par. Nos. 1-7, above.

9. The decision of Council to suspend Plaintiff without pay was upon recommendation of Defendant Wood in this regard rather than for financial considerations. *See* Plaintiff's Deposition, Defendants' Exhibit "A", p. 150, which is a recitation of the minutes of the Meeting of Council of February 13, 2006. The Minutes of the Special Meeting of February 13, 2006 ("Minutes"), fail to reveal a financial consideration in Council's decision upon Defendant Wood's

recommendation to suspend Plaintiff without pay. A copy of the Minutes is attached to this Response and marked as <u>Plaintiff's Exhibit No. "4"</u>. Consequently, the motivation behind Defendant Wood's recommendation in that regard, as affirmed by Council at its Meeting of February 13, 2006, presents a genuine issue of material fact in dispute as to the motivation behind Defendant  Wood's suspension of Plaintiff without pay, as Section 752.4 of CLEA is silent with respect such suspension. *See* <u>Plaintiff's Exhibit No. "3"</u>.

10-11, 13. It is admitted that Plaintiff was acquitted on September 19, 2006, of all charges filed against him, that he was reinstated and that he was paid for his time between acquittal and the date of his return or November 11, 2006. However, Plaintiff was owed back pay from the time of his suspension without pay (February 14, 2006 until September 19, 2006) until his acquittal. Defendant Edgewood, however, refused to  allow Plaintiff to properly  grieve his request therefor and, instead, required  Plaintiff to follow a sham grievance procedure which Defendants Edgewood and Wood knew would result in Plaintiff's inability to  obtain the back pay. <u>Plaintiff's Exhibit No. 1, Par. No. 36</u>. Defendant Hockenberry called the Fraternal Order of Police ("FOP"), which had agreed to assist Plaintiff to grieve for his back pay with free legal advice, with the request not to do so. <u>*Id.*, Par. No. 76</u>.  Defendant Quinn also, as President of the Edgewood Police Officer's Association ("EPOA"), advised Plaintiff  that the EPOA would not advocate for Plaintiff's back pay. It was defendant Quinn's duty as FOP representative to assist Plaintiff in preparing a grievance to obtain the latter's back pay. <u>Deposition of Keith Nugent ("Nugent") ("D.N."), p. 34</u>; <u>Deposition of Mark Ratajeski ("Ratajeski") ("D.R."), p. 32</u>; <u>Deposition of Donald Hamlin ("Hamlin") ("D.H."), p, 28</u>. The relevant excerpts of Nugent's Deposition are attached to this Response and marked as <u>Plaintiff's Exhibit No. "5"</u>. The relevant excerpts of Ratajeski's Deposition are attached to this Response and marked as <u>Plaintiff's Exhibit No. "6"</u>. The relevant excerpts of Hamlin's Deposition are attached to this Response and marked as <u>Plaintiff's Exhibit No. "7"</u>. Defendant Quinn advised Plaintiff that the latter did not deserve the assistance of the EPOA with regard to  his back pay. <u>Plaintiff's Exhibit No., "1", Par. No. 86.</u>

Additionally, Defendant Quinn refused to recuse himself as the step in the grievance procedure for back pay because of a conflict of interest. *Id.*, Par. No. 100. *See also* D.H., at pp. 15-16, 17-18. Defendant Quinn was urged by Hamlin to put personal differences aside because it was Defendant Quinn's position, as the FOP representative, to assist Plaintiff. *Id., at 21*. Defendant Quinn stated that he would not assist Plaintiff with the grievance procedure to obtain the latter's back pay after reinstatement, even though Defendant Quinn was, at that time, the FOP representative. Instead, Defendant Quinn referred to Plaintiff as a "Black ass motherf[-----]". *Id., at 20, 22*.

12. Chief Wood's decision to recommend reinstatement of Plaintiff following the latter's acquittal was born of necessity since, after his investigation, he concluded "that there was no evidence that would preclude us from bringing him back to work, and that's what we did." Defendants' Exhibit "B", p. 63. In effect, since no evidence had existed to preclude Plaintiff's reinstatement, this would raise a genuine issue of material fact in dispute that no evidence had existed from the inception of the criminal charges to suspend Plaintiff without pay or even to try him in the first instance. Additionally, Section 752.3(1) of CLEA, 53 P.S. §752.3(1), prescribes the specific circumstance, relevant to the matter at bar, under which a law enforcement officer may **not** continue to be employed as one "when the individual has been convicted of…[a]n offense graded a felony or a serious misdemeanor." Plaintiff was acquitted. The text of Section 752.3 of CLEA is attached to this Response and marked as Plaintiff's Exhibit No. "8".

14, 16-18. Admitted.

15. Admitted. However, Defendant Quinn hated Plaintiff because the latter had received a higher overall score on the examination for a full-time position with the Police Department and because Defendant Quinn is a racist. Plaintiff's higher score entitled Plaintiff to seniority over Defendant Quinn in terms of schedule preference choices. Defendant Quinn took the position that he should have been given seniority over Plaintiff because Defendant Quinn had obtained a higher score than had Plaintiff on the written portion of the examination. Defendant Quinn also

maintained that the interview portion of the examination had favored Plaintiff because the examiners "liked" Plaintiff better. Quinn had displayed a great deal of animosity about the scoring of the examination. <u>Deposition of Troy Garrett ("Garrett") (D.G."), p. 99</u>. The relevant excerpts of Garrett's Deposition are attached to this Response and marked as <u>Plaintiff's Exhibit No. "9"</u>. Moreover white officers were permitted to take overlapping vacations. prior to his arrest, Plaintiff was the Officer in Charge ("O.I.C.") of his shift. Upon his return following his acquittal, however, he was no longer the O.I.C. for the shift. When Plaintiff had requested three weeks' vacation, he was able to obtain two weeks because of his seniority.  However, with respect to the third week, Defendant Quinn, who was next in seniority, had requested the same week which Plaintiff had requested. He refused to relinquish that week to Plaintiff. Moreover, <u>Deposition of Dennis Hockenberry ("Hockenberry") ("D.D.H."), pp. 80-81</u>. The relevant excerpts of Hockenberry's Deposition are attached to this Response and marked as <u>Plaintiff's Exhibit No. "10"</u>.  The comments and behavior of Defendant Quinn and the acknowledgement of the same by Defendant Hockenberry would give rise to a genuine issue of material fact in dispute that Defendant Quinn's refusal to accommodate Plaintiff and Defendant Hockenberry's acquiescence therein was racially motivated and had contributed to the creation of a hostile work environment for Plaintiff.   Hockenberry lied to Payne.

19-20. Garrett thought it inappropriate, strange and unprofessional that Defendant Quinn had been sent by Defendant Wood to monitor Plaintiff's trial for Defendant Edgewood in light of the relationship existing between Defendant Quinn and Plaintiff, <u>D.G., p. 54</u>, thus giving rise to a genuine issue of material fact in dispute as to the motivation of Defendant Wood in sending Quinn to monitor the trial and as to the motivation of Defendant Quinn in seeking out the assignment to "represent" Defendant Edgewood as some type of official monitor.  Defendant Quinn instead of monitoring the trial because part of the prosecution team provided Commonwealth with names of people whom he knew hated Plaintiff because of his race and would provide negative character testimony. Additionally, this testimony violated the Police

Policy Manual which stated that only witnesses material to a particular case would be permitted to testify.

21-22.  This Honorable Court is requested to take judicial notice of the fact that each witness' testimony went to its credibility which was weighed accordingly by the fact finder—the jury—at Plaintiff's trial, which fact-finder had acquitted Plaintiff.   Defendant Quinn's choice of these particular witnesses, some of whom are Defendants instantly, raises a genuine issue of material fact in dispute as to whether his choices echoed his racial animus towards Plaintiff and that of Defendants.   This is reflected in the fact that he and the witnesses whom he had chosen had engaged in the following conduct towards Plaintiff which raises a genuine issue of material fact in dispute as to whether his and their motivation for engaging in such conduct was engendered by racial bias,  animus and discrimination towards Plaintiff:

 (1) Plaintiff returned to work on November 11, 2006. However, upon Plaintiff's acquittal and upon his subsequent return,  Defendant Quinn stated that Plaintiff was guilty of the charges, used the "N" word with  respect to Plaintiff and referred to Plaintiff as "Black  Ass" and "Black motherf[----].D.H., p. 20; D.N., p. 42; D.R., pp. 21, 61, 62.

(2) Defendant Quinn and the other Defendants in this matter would also mimic Plaintiff's mode of speech by pronouncing each spoken word as though it were ending with the letter "S" because that is the way in which they perceived that Plaintiff spoke in Ebonics. D.R. at p. 22.

(3) Defendant Quinn was also dismayed at Plaintiff's acquittal. D.H., at p. 20. He stated that he would not be able to make the tee shirts with Plaintiff's caricature thereon. *Id*.  Moreover, Defendant Quinn informed Hamlin that the former had designed a caricature of Plaintiff which consisted of a  picture of a black face behind bars with the statement "Free  Fred". *Id*., at p. 21; D.N., at pp. 25, 26. Kurt Ferguson ("Ferguson"), the Edgewood Borough Manager, had also been told that Defendant Quinn had made the "Free Fred" caricature. Deposition of Ferguson ("D.F."), p. 13. The relevant excerpts of Ferguson's Deposition are attached to this Response and marked as Plaintiff's Exhibit No. "11". Defendant Quinn showed this caricature to Nugent

which the latter saw on a police computer. <u>D.N., at 25, 26</u>; <u>D.F., at 14</u>.  Defendant Quinn was going to make the tee  shirts and sell  them had Plaintiff been  convicted. <u>D.H., at pp. 20, 21</u>.

(4) Defendant Quinn stated that he would not assist Plaintiff with the grievance procedure in order to obtain the latter's back pay after reinstatement, even though Defendant Quinn was, at that time, the FOP representative and, instead,  referred to Plaintiff as a "Black ass motherf[-----]" <u>Id., at 20, 22</u>. Defendant Quinn was urged by Hamlin to put personal differences aside because it was Defendant Quinn's position, as the FOP representative, to assist Plaintiff. <u>Id., at p. 21</u>.

(5) Defendant Quinn made a physical threat against  Plaintiff,  threatening to beat Plaintiff's ass. <u>Id., at p. 28; D.N., at p. 34; D.R., at p. 32</u>.

(6) Defendant Quinn also remarked, with respect to Plaintiff, "the black motherf[------] is guilty", "F[----] the Niggar"[sic] and "Fred's black ass is guilty". <u>D.N., at p. 31</u>.

(7) Defendant Quinn stated that if Plaintiff returned to work following his acquittal, the former would not assist Plaintiff in learning or relearning the computer system and would work to create a hostile work environment for Plaintiff. <u>D.R., at  pp. 17, 24, 30-31, 32, 65</u>.  Defendant Quinn was in charge of computer training. "[H]e was the...computer guy for the police department, the guy that taught everybody else and got everybody certified on the computers." <u>Id., at pp. 65-66</u>. Defendant Quinn did indeed create a hostile working environment for Plaintiff because he did not take the time to teach Plaintiff about the computer system.

(8) Defendant Quinn took the position that Fred was being treated better than the other Officers. D.G., at p. 27.

(9) Prior to Plaintiff's trial but following his suspension  from  the Police Department, Defendant Quinn stated: "[Plaintiff] did it and he is going to jail for the rest of his life[.] [H]e's not going to be a policeman here." <u>D.G., p. 25</u>.

(10) Quinn was also spreading rumors that DNA evidence existed against Plaintiff. <u>Id., at p. 26</u>; <u>D.L.L.")</u>, p. 83.

(11) Quinn also stated that Fred would never return to work and that he was attempting a plea bargain. _Id_.

(12) Defendant Quinn thought that Plaintiff's daughter Nataesha had done a good job of testifying against Fred at trial. D.R., at p. 17. Defendant Quinn believed that Plaintiff was guilty of the charges regarding sexual assault upon his daughter Naetasha after he became aware of the nature of the charges. His reasoning was that a daughter would not say things of that nature about her father unless it were true. Deposition of Tim Quinn ("Quinn") ("D.Q."). The relevant excerpts of Quinn's deposition are attached to this Response and marked as Plaintiff's Exhibit No. "12". D.Q., p. 79. In conjunction with the foregoing, Defendant Quinn informed Defendant Wood that Plaintiff was lying on the stand because his mouth was open. D.R., at pp. 15, 29.

Plaintiff was also treated differently following his arrest. _D.G._, at pp. 15, 16,17, 30, 44, 55, 57, 63, 81-82, 87, 88, 96, 102; D.W., at p. 38; D.H., at pp. 18, 26, 31, 50; D.N., at p. 18; M.R., at pp. 20,22, 42, 43, 61, 62, 68, 72; Deposition of Leslie Lewis ("L. Lewis") ("D.L.L."), at pp. 13-15, 17, 28-30, 50, 51, 75, 77, 78, 79, 88-89, 90, 91-92; Deposition of Mike Libell, ("Libell") ("D.L."), pp. 22-23, 75-76; Deposition of Larry Guierro ("Guierro") ("D.L.G."), pp. 16-17, 29, 49, 50, 52. The relevant excerpts of L. Lewis' Deposition are attached to this Response and marked as Plaintiff's Exhibit No. "13". The relevant excerpts of Libell's Deposition are attached to this Response and marked as Plaintiff's Exhibit No. "14". The relevant excerpts of Guierro's Deposition are attached to this Response and marked as Plaintiff's Exhibit No. "15".

Defendants never responded to Plaintiff's or Donna Lewis' complaints of racial discrimination.

Defendants failed to prosecute Defendant Quinn for over time fraud and impersonating a Swissvale officer.

Defendants failed to prosecute Defendant Ferguson who twice impersonated a police officer and who was accused of stealing money from the Defendant Edgewood and the soda machines and of using illegal drugs.

23-30. The testimony of these prosecution witnesses as to Plaintiff's reputation for dishonesty and untruthfulness went to their credibility which was weighed accordingly by the fact finder—the jury, whose verdict of acquittal reflected its disbelief of the witnesses' testimony. The jury's verdict of acquittal reflecting disbelief of the witnesses' testimony raises a genuine issue of material fact in dispute as to whether the motivation of Defendants Edgewood, Wood (as the one who sent Defendant Quinn to monitor the trial, D.D.H., p. 65) and Quinn (as the anointed official representative of Defendant Edgewood at trial, Id.), in securing these witnesses for the prosecution, was fired by racial discrimination and racial animus towards Plaintiff. The Defendants who so testified were Defendants Hockenberry and Quinn.

31. Plaintiff did not foster a tense, unpleasant environment. Instead, this was result of the individual Defendants' having testified falsely as to Plaintiff's reputation for truthfulness and honesty, which false testimony contributed to the creation of a hostile work environment for Plaintiff. In the exercise of his employment duties, Plaintiff was required to interact on a daily basis with the very individual Defendants who had uttered this false testimony.   D.L., 44, 45; D.R., pp. 33, 34, 42-43, 66-68; D.G., 50-51; D.L.G., p. 35, 58. Defendant Wood did not wish Plaintiff to return to work even if he were acquitted because it would create too many problems. D.L.G., pp. 20-21, 56. In fact, Defendant Wood distanced himself from Plaintiff after the latter's arrest and did not support him in the manner in which he should have as Chief. Defendant Wood believed that even though Plaintiff had been acquitted, the latter should no longer work on the Police Force because of a lack of trust. D.R., p. 18. Additionally, Plaintiff's paycheck was torn up.   The tense and unpleasant work environment therefore raises a genuine issue of material fact in dispute as to whether it was the product of racial animus and bias towards Plaintiff and whether it served to create a hostile work environment for Plaintiff.

Plaintiff's mail was never forwarded to him.   Plaintiff's personally fitted bulletproof vest was given away.   Plaintiff worked two years without a safety vest. Defendant Hockenberry would not back up Plaintiff. Defendant Hockenberry sent numerous emails to Plaintiff to chastise

him. Defendant Wood told everyone in the Police Department to write down what Plaintiff would say to them. Plaintiff's daily reports were destroyed. Plaintiff was cited for being late by Kaskie the first day of his return to work following his acquittal.

32-37, 41-43.  The friendship between Plaintiff and Defendant Hockenberry came to a halt following Plaintiff's arrest and continued in this fashion. D.L.G., pp. 15, 16, 34, 35; D.L., 26-27, 42, 35. Following Plaintiff's arrest, Defendant Hockenberry refused to have anything further to do with Plaintiff. D.R., p. 16. However, Defendant Hockenberry, together with Defendants Wood, Ferguson, Crow and Quinn, contributed to the tense, unpleasant work environment which existed when Plaintiff returned to work. D.L., pp. 44-45. See also D.H., pp. 80-81. Libell was informed by Defendant Hockenberry not to associate with Plaintiff and to distance himself from Plaintiff. D.L., pp. 34-35. Plaintiff was being harassed by Defendant Hockenberry and was being sent excessive emails by the latter, since the two did not speak with each other. Id., p. 37. Plaintiff believed that the foregoing acts on the part of Hockenberry served to create a hostile work environment for Plaintiff. D.W., p. 140. Moreover, Defendant Hockenberry did not like people who asked questions or wanted to understand how things worked. He was unwilling to explain and did not seem to want to deal with certain people among whom were Plaintiff, after his arrest, Garrett and L. Lewis. D.G., pp 19-20. By way of further answer, Plaintiff refers this Honorable Court to his Response to Par. No. 31, above.

Hockenberry would not back Fred Livingston up.  Hockenberry sent numerous spurious emails to Fred Livingston to chastise him.  Cited first day at work for being late by Kaskie.  Chief told everyone write down what Fred Livingston says to them.  Hockenberry told people to shun Fred Livingston.  Plaintiff's daily reports were destroyed.

38.  Plaintiff trusted Defendant Wood and respects the latter as Chief of Police. See Defendants' Exhibit "PP" However, Plaintiff subsequently recognized that since Defendants Wood and Hockenberry were friends that the former was ratifying the latter's racially discriminatory conduct towards Plaintiff as did Mayor Davin, Deposition of Plaintiff ("D.P."), pp.

222, 223; D.D.H., pp. 80-81, thus creating a genuine issue of material fact in dispute concerning the motivation of Defendant Wood in conducting himself as aforesaid and in ratifying the racially discriminatory conduct of Defendant Hockenberry. *See also* Response to Par. No. 31, above. The relevant excerpts of the Deposition of Plaintiff are attached to this Response and marked as Plaintiff's Exhibit No. 16.

39-40. By way of answer, Plaintiff refers this Honorable Court to his Responses to Par. Nos. 31, 32-37, 41-43, above.

44-47. Following Fred's arrest, Defendant Ferguson did not bother with Plaintiff and did not trust him. D.R., pp.18, 56. Defendant Ferguson would have been happy had Plaintiff not returned to the Police Force. He did not want Plaintiff to work at the Police Department any longer. D.R., p. 38. Additionally, others who had dealings with Defendant Edgewood did not wish to do business with Defendant Ferguson and, because of him, with Defendant Borough. D.R., p. 13. Defendant Ferguson, together with Defendants Wood, Hockenberry, Crow and Quinn, contributed to the tense, unpleasant work environment which existed when Plaintiff returned to work, D.L., pp. 44-45; D.D.H., pp. 80-81, thus raising a genuine issue of material fact in dispute as to whether these Defendants created a hostile work environment for Plaintiff. Guerriero was informed by Defendant Ferguson not to associate with Plaintiff and to distance himself from Plaintiff. D.L.G., pp. 13-14, 21-22. Defendant Ferguson became angry when Guerriero continued to interact with Plaintiff. *Id.*, p. 22. Following Plaintiff's arrest, Defendant Ferguson used the "N" word against Plaintiff. Defendant Ferguson "knew in his heart that [Plaintiff] was guilty. He perceived in his own mind before [Plaintiff] even got into court that he was guilty" and that "[Plaintiff] was a no good black son of a b[---]". *Id.*, pp. 14, 42-44, 48. Even after Plaintiff had been acquitted, Defendant Ferguson continued to state that Plaintiff was guilty. *Id.*, p. 14.

48-49, The events set forth in these Paragraphs occurred prior to Plaintiff's arrest and suspension. In this regard, Plaintiff directs this Honorable Court to his Responses to <u>Par. Nos. 31 and 38</u>, above.

50-52. By way of answer, Plaintiff directs this Honorable Court to his Response to <u>Par. Nos. 21-22</u>, above, and incorporates by way of reference into this Response his Answer to Defendant Quinn's Concise Statement.

53-57. Admitted.

58-59. However, Defendant Quinn was jealous of Plaintiff because the latter had received a higher overall score in the examination for a full-time position with the Police Department and because he was a racist.   Plaintiff's higher score entitled Plaintiff to seniority over Defendant Quinn in terms of schedule preference choices. Defendant Quinn took the position that he should have been given seniority over Plaintiff because Defendant Quinn had obtained a higher score than had Plaintiff on the written portion of the examination. Defendant Quinn also  maintained that the interview portion of the examination had favored Plaintiff because the examiners "liked" Plaintiff better. Defendant Quinn had displayed a great deal of animosity about the scoring of the examination. <u>D.G., p. 99</u>.   Prior to his arrest, Plaintiff was the Officer in Charge ("O.I.C.") of his shift. Upon his return following his acquittal, however, he was no longer the O.I.C. for the shift. When Plaintiff had requested three weeks' vacation, he was able to obtain two weeks because of his seniority.   However, with respect to the third week, Defendant Quinn, who was next in seniority, and had overlapped with Defendant Hockenberry, had requested the same week which Plaintiff had requested. He refused to relinquish that week to Plaintiff which, in light of other comments and behavior of Defendant Quinn, would give rise to the notion that Defendant Quinn's refusal to  accommodate Plaintiff was racially motivated. <u>D.D.H., pp. 80-81</u>.

60-76. With the exception of the Busy Beaver detail and the Gang Resistance Program, other activities and details were either reassigned or discontinued during Plaintiff's suspension.

Defendant Wood removed Plaintiff from the D.A.R.E. and the Crime Prevention programs and, upon Plaintiff's return following his acquittal, Plaintiff was not reassigned to any of the programs of which he had formerly been in charge. D.R., p. 39.   Following Plaintiff's suspension, the Police Department no longer had a school resource officer or a Steeler basketball program, which programs Plaintiff had operated before his suspension. D.L., p.  55. The bike rodeo, which Plaintiff had operated with Defendant Quinn, had no longer existed. Id., 56. Plaintiff had also instituted the "Click It or Ticket" program which, following Plaintiff's suspension and even following his return to the Police Force, was being operated by Nugent and by Officer Michael Ferguson ("M. Ferguson"). Id. Moreover, Defendant Quinn was jealous that Plaintiff, a black man, had been chosen to assist with the D.A.R.E. and the Crime Prevention programs and various programs for children. Id., p. 57.   Thus, the issue whether the foregoing programs and detail were eliminated or reassigned to   someone else in order to prevent Plaintiff from operating or working them following his return to the Police Force creates a genuine issue of material fact in dispute as to Defendants' racial animus and bias towards him. With respect to the Citizens' Police Academy   ("Academy") operated by L. Lewis, with which Plaintiff had assisted and which terminated at the time of L. Lewis' resignation from the Police Force, a genuine issue of material fact exists as to whether the discontinuance of programs which Plaintiff had operated prior to his suspension was the result of racial bias and animus on the part of Defendants, especially since Plaintiff had assisted with this Program prior to his suspension and especially since he was not requested to resurrect it following his return, in light of his interest in and operation of other Police Department Programs prior thereto.  Plaintiff was demoted to abandoned autos.

77-79.   Plaintiff had responsibility for the Newsletter prior to his suspension. When he returned to the Police Force, Defendant Wood had asked Plaintiff if he wished to resume the Academy and the Newsletter, to which Plaintiff responded affirmatively. D.P., p. 145. However, once Plaintiff had filed a Complaint with the Equal Employment Opportunity Commission

("EEOC"), he never heard anything further about resurrecting the Academy. _Id., p. 146_. With respect to the Newsletter, Defendant Wood approached Plaintiff following his return to the Police Force about Plaintiff's interest in resuming the same.  Defendant Wood stated to Plaintiff in this regard: "I think it's almost time to get you  back, ready to get you back doing a lot of programs." _Id., at 149_. However, that project, also, never materialized. _Id_. Plaintiff also incorporates by way of reference herein his Responses to Paragraph Nos. 31 and 38, above, all of which gives rise to a genuine issue of material fact in dispute as to whether Defendant Wood's conduct was the result of racial animus and bias towards Plaintiff and whether his conduct served to create a hostile work environment for Plaintiff.  Defendants never investigated Plaintiff's five complaints of racial harassment.

80-101. Plaintiff was owed back pay from the time of his suspension without pay  until his acquittal. Defendant Edgewood, however, refused to  allow Plaintiff to properly  grieve his request therefor, requiring, instead, that Plaintiff follow a sham grievance procedure which Defendants Edgewood and Wood knew would result in Plaintiff's inability to  obtain the back pay. Plaintiff's Exhibit No. 1, Par. No. 36. Defendant Hockenberry called the FOP, which  had agreed to assist Plaintiff by providing free legal assistance to grieve for his back pay, with the request not to do so. _Id., Par. No. 76_.  Defendant Quinn also, as President of the EPOA, had advised Plaintiff  that the EPOA would not advocate for Plaintiff's back pay. It was Defendant Quinn's duty as FOP representative to assist Plaintiff in preparing a grievance to obtain the latter's back  pay. D.N., p. 34; D.R., p. 32; D.H., p, 28. Defendant Quinn advised Plaintiff that the latter did not deserve the assistance of the EPOA with regard to  his back pay. Plaintiff's Exhibit No., "1", Par. No. 86. Additionally, Defendant Quinn refused to  recuse himself as the step in the grievance procedure for back pay because of a conflict of interest. _Id., Par. No. 100_. _See also_ D.H., at pp. 15-16, 17-18. Defendant Quinn was urged by Hamlin to put personal differences aside because it was Defendant Quinn's position, as the FOP representative, to assist Plaintiff. _Id., at 21_. Defendant Quinn stated that he would not assist Plaintiff with the grievance procedure

to obtain the latter's back pay after reinstatement, even though Defendant Quinn was, at that time, the FOP representative. Instead, Defendant Quinn referred to Plaintiff as a "Black ass motherf[-----]". *Id., at 20, 22*. By way of further Response, Plaintiff also incorporates by reference his Response to Defendant Quinn's Concise Statement as though the same were fully set forth herein.

102. This incident raises a genuine issue of material fact in dispute as to whether Defendants were engaging in a series of racially harassing conduct toward Plaintiff.

103-106. The incident concerning Plaintiff's application for a position with the State Police gives rise to a genuine issue of material fact in dispute that Defendants' conduct, as set forth in Plaintiff's Complaint and as relayed in the various Depositions set forth throughout this Response, constitutes racial animus and bias towards and harassment of Plaintiff resulting, *inter alia*, in Plaintiff's inability to procure such position because of this conduct.

107-108. Officer Lawrence is not a Defendant in this matter.

109-115. By way of answer, Plaintiff directs this Honorable Court to his Responses to Par. Nos. 31-43, above.

116. Plaintiff, in his Complaint to the EEOC, described acts of a racially discriminatory nature which constituted a hostile work environment for him. *See* Defendants' Exhibit "DD".

117-120, 123-125. By way of answer, Plaintiff directs this Honorable Court to his Responses to Par. Nos. 31-43, above. With respect to the conduct of Defendant Quinn alleged in Par. No. 125, when Plaintiff had requested three weeks' vacation, he was able to obtain two weeks because of his seniority. However, with respect to the third week, Defendant Quinn, who was next in seniority, had requested the same week which Plaintiff had requested. He refused to relinquish that week to Plaintiff. D.D.H., pp. 80-81. However, white officers were permitted to take overlapping vacations. The comments and behavior of Defendant Quinn and the acknowledgement of the same by Defendant Hockenberry would give rise to a genuine issue of material fact in dispute that Defendant Quinn's refusal to accommodate Plaintiff and Defendant

Hockenberry's acquiescence therein demonstrated racial bias and animus toward Plaintiff and contributed to the creation of a hostile work environment for him.

121-122. It is admitted that Plaintiff wore an ill-fitted, unsafe, non-personalized vest from November 2006 until Spring 2009. However, Plaintiff did not receive such new vest until approximately some time in 2008. Deposition of Susan Kaskie ("Kaskie") ("D.K."), p. 113. The relevant excerpts of the Deposition of Kaskie are attached to this Response and marked as Plaintiff's Exhibit No. "17". Moreover, it was important for a police officer to wear a vest which had been personally fitted to him/her. Id., p. 114. The foregoing give rise to a genuine issue of material fact in dispute as to whether Defendant Edgewood  had engaged in conduct amounting to racial animus and bias towards and created a hostile work environment for Plaintiff by providing him with an ill-fitting vest and by not providing him with a personally fit vest for approximately two years following receipt by Defendant Edgewood of new vests.

126. Defendant Crow stated that he had initially believed that Plaintiff was not guilty of the criminal charges. However, when the charges withstood the Preliminary Hearing and when Plaintiff was held for trial, Defendant Crow changed his mind because he believed that the charges would not have made it to trial if the allegations thereof had not been true. Deposition of Michael Crow ("Crow") ("D.C."), p. 22. The relevant excerpts of the Deposition of Crow are attached to this Response and marked as Plaintiff's Exhibit No. "18". He did not necessarily believe that Plaintiff was guilty of rape but, perhaps, of a lesser offense involving Plaintiff's daughter Naetasha. Id., p. 64.  Defendant Wood informed everyone that Plaintiff Livingston was guilty.

127-129. By way of answer, Plaintiff refers this Honorable Court to his Response to Par. Nos. 44-47, above.

130-137. It is admitted that Garrett is African-American. By way further answer, Garrett's Deposition reveals the following:

(1) Defendant Quinn was jealous of Plaintiff because the latter had received a higher overall score in the examination for a full-time position with the Police Department.  Plaintiff's higher score entitled Plaintiff to seniority over Defendant Quinn in terms of schedule preference choices. Defendant Quinn took the position that he should have been given seniority over Plaintiff because Defendant Quinn had obtained a higher score than had Plaintiff on the written portion of the examination. Defendant Quinn also maintained that the interview portion of the examination and because of Defendant Quinn's animus had favored Plaintiff because the examiners "liked" Plaintiff better. Quinn had displayed a great deal of animosity about the scoring of the examination. D.G., p.  99.

(2) Garrett thought it inappropriate, strange and unprofessional that Defendant Quinn had been sent by Defendant Wood to monitor Plaintiff's trial for Defendant Edgewood in light of the relationship existing between Defendant Quinn and Plaintiff, Id., p. 54.

(3) Prior to Plaintiff's trial and following his suspension, Defendant Quinn remarked, "[Plaintiff] did it and he is going to jail for the rest of his life[.] [H]e's not going to be a policeman here." Id., p. 25.  Hamlin felt that Defendant Quinn was a racist.

(4) Plaintiff was required to interact on a daily basis with the very individual Defendants who had uttered false testimony against him at trial. Id., 50-51.

(5) Defendant Hockenberry did not like to interact with people who asked questions or wanted to understand how matters worked. Defendant Hockenberry was unwilling to explain and did not appear to wish to deal with certain individuals, among whom were Plaintiff, after his arrest, Garrett and L. Lewis. Id., 19-20.

138. M. Ferguson testified at his Deposition as follows:

(1) Plaintiff and Defendant Hockenberry did not get along, and Defendant Hockenberry would avoid Plaintiff. Deposition of M. Ferguson ("D.M.F."), p. 9. The relevant excerpts of the Deposition of M. Ferguson are attached to this Response and marked as Plaintiff's Exhibit No.

19.  In this regard, Plaintiff also  refers this Honorable Court to his Response to Par. Nos. 32-37, 41-43, above.

(2) Defendant Quinn was irritating Fred. *Id., p 11*.

(3) M. Ferguson had heard of the situation involving the "Free Fred" caricature and believed that  the logo was on a T-shirt which, he had been informed, had been designed by Defendant Quinn. *Id., p. 13*.

(4) Libell had informed M. Ferguson that the caricature of Fred had appeared on Defendant Edgewood's computer. *Id., p. 14*. With respect to Defendant Quinn, Plaintiff also refers this Honorable Court to his Response to Par. Nos. 10-11, 13, 15, 19-30, 58-59, 80-101, above. Plaintiff additionally incorporates by reference his Response to Defendant Quinn's Concise Statement as though the same were set forth herein.

139. Admitted. However, gender discrimination is not at issue in this case.

140-142. By way of answer, Plaintiff refers this Honorable Court to his Response to Par. Nos. 44-47. Whether this particular conduct on the part of Defendant Ferguson was motivated by his racial bias and animus towards Plaintiff and served to create a hostile work environment for Plaintiff gives rise to a genuine issue of material fact in dispute. Additionally, Defendant Ferguson's treatment of Donna Lewis indicated that Defendant Ferguson was a racist.

143-144, 146, 148-149. Defendant Ferguson, at the time of the events in question, served as the Manager of Defendant Edgewood. D.F., pp. 8, 10. Borough Ordinance No. 964 sets forth in Section V thereof the specific powers and duties of Defendant Ferguson, *inter alia*, as follows:

(1) He is responsible for carrying out all policies and programs of Defendant Edgewood.

(2) He shall prepare a budget and a schedule of compensation for each appointed office and position for the approval of Defendant Edgewood's Council.

(3) He shall attend all Council Meetings and participate in the discussions therein.

(4) He shall manage finances and prepare a financial report for Council.

(5) He is responsible for all purchasing and capital purchases not in excess of $3,999.99 per item.[1]

(6) He shall keep a current inventory of all Defendant Edgewood's property.

(7) All complaints regarding services of personnel shall be referred to Defendant Ferguson, even though they may involve personnel not under his supervision and shall be referred to the appropriate supervisory personnel.

(8) He shall be responsible for the overseeing of all computer hardware, software, networking, and the appropriate use of all equipment owned, leased and operated by Defendant Edgewood. Defendants' Exhibit "TT".

Section VII authorizes the Mayor to delegate to Defendant Ferguson all non-legislative and non-judicial powers and duties of which Council may approve. *Id*. Section VIII authorizes Defendant Ferguson to utilize the services of , *inter alia*, of Defendant Edgewood's Solicitor. *Id*.

The duties of Defendant Ferguson in his capacity as Defendant Edgewood's Manager give rise to a genuine issue of material fact in dispute whether, in light of the aforesaid recited duties, Defendant Ferguson employed the power of his position to create a hostile work environment for Plaintiff.

145-147. The Mayor's duties are set forth in the Borough Code, specifically, at 53 P.S. §§46028, 46029. The duties of Defendant Wood as set forth in Defendants' Exhibits "U" and "V" give rise to a genuine issue of material fact in dispute whether, in light of the aforesaid recited duties, Defendant Wood employed the power of his position to create a hostile work environment for Plaintiff. By way of further answer, Plaintiff also refers this Honorable Court to his Response to Par. Nos. 31, 38, 77-79, above.

150-152. The complaints set forth herein give rise to a genuine issue of material fact in dispute as to whether Defendants had conspired between and among each other to act in a

---

[1] As amended by Ordinance No. 1004. *See* Defendants' Exhibit "TT".

racially discriminatory manner towards Plaintiff and to create a hostile work environment for him in conspiring to remove Plaintiff from Defendant Edgewood's Police Force.

153-158, 160. Kaskie is not named as a Defendant in this cause of action. The matter of Plaintiff's pay relates specifically to the recoupment of Plaintiff's back pay. In this regard, Plaintiff refers this Honorable Court to his Response to <u>Par. Nos. 10-11, 13, 80-101</u>, above.

159. By way of answer, Plaintiff refers this Honorable Court to his Response to <u>Paragraph Nos. 31-43</u>, above.

161. By way of answer, Plaintiff refers this Honorable Court to his Response to <u>Paragraph Nos. 10-11, 13, 80-101</u>, above.

162. What Kaskie believes or disbelieves, in light of all evidence set forth in this Response, is an issue of credibility and, therefore, raises a genuine issue of material fact in dispute as to whether Defendants' conduct was racially biased towards Plaintiff and whether it served to create a hostile work environment for him.

163-166. It is admitted that L. Lewis is an African-American female who was employed as a full time Police Officer for Defendant Edgewood from September 2000 through January 2006. With respect to Hockenberry's conduct *vis `a vis* Plaintiff, Plaintiff refers this Honorable Court to his Response to <u>Par. Nos. 32-37, 41-43</u>, above, which gives rise to a genuine issue of material fact in dispute as to whether the conduct of Defendant Hockenberry was motivated by racial animus and bias towards Plaintiff and whether it served to create a hostile work environment for Plaintiff because Defendant Hockenberry is a racist and a sexist.

167. By way of answer, Plaintiff refers this Honorable Court to his Response to <u>Par. Nos. 10-11, 13, 15, 21-22, 58-59, 80-101, 117-120, 123-125, 130-137, subpar. nos. (1)-(3), 138, subpar. no. (2)-(3),</u> above, which gives rise to a genuine issue of material fact in dispute as to whether the conduct of Defendant Quinn was motivated by racial animus towards Plaintiff and whether it served to create a hostile work environment for Plaintiff.

168. By way of answer, Plaintiff refers this Honorable Court to his Response to <u>Par. No.</u> <u>126</u>, above, which gives rise to a genuine issue of material fact in dispute as to whether the conduct of Defendant Crow was motivated by racial animus towards Plaintiff and whether it served to create a hostile work environment for Plaintiff.

169. By way of answer, Plaintiff refers this Honorable Court to his Response to <u>Par. Nos.</u> <u>31, 38, 77-79</u>, above.

170. By way of answer, Plaintiff refers this Honorable Court to his Response to <u>Par. Nos.</u> <u>44-47</u>, above.

171-173. Heidi McDonald ("McDonald") testified that  she believed that Plaintiff was innocent until she had seen psychiatric reports regarding the examination of Plaintiff's daughter Naetasha, the victim.  This was provided to Defendant Wood by Allegheny County Detectives. <u>Deposition of McDonald ("D.Mc."), pp. 70-71, 72</u>. The relevant excerpts of McDonald's Deposition are attached to this Response and marked as <u>Plaintiff's Exhibit No. "20"</u>. Following Plaintiff's acquittal, Council reinstated Plaintiff's pay. <u>Id.</u>, p. 71. McDonald also stated that she created a musically mixed CD which she titled "Cheer Yo Ass Up" and gave it to Plaintiff. <u>Id.</u>, 63. McDonald then testified, "So we were trying to do everything we could to support him during the process, but we couldn't continue to pay him indefinitely when it wasn't budgeted for and we were down to one police officer and this was running into overtime. **I mean, the reason why we stopped paying him was a financial concern.**" <u>Id.</u>, p. 71. (Emphasis supplied). However, the Minutes fail to reveal a financial consideration in Council's decision to affirm Defendant Wood's recommendation to suspend Plaintiff without pay. See <u>Plaintiff's Exhibit No. "4"</u>. The discrepancy between McDonald's Deposition in this regard and <u>Plaintiff's Exhibit No. "4"</u>, in addition to her gift to Plaintiff of a musically mixed CD which she created and titled "Cheer Yo Ass Up", give rise to a genuine issue of material fact in dispute as to whether the conduct of McDonald, an Officer of Defendant Edgewood, was racially discriminatory toward Plaintiff and contributed to the creation of a hostile work environment for him.

By way of further answer, Plaintiff also refers this Honorable Court to his Response to Par. No. 9, above.

174-176. By way of answer, Plaintiff refers this Honorable Court to his Response to Par. Nos. 10-11, 13, 15, 21-22, 58-59, 80-101, 117-120, 123-125, 130-137, subpar. nos. (1)-(3), 138, subpar. no. (2)-(3), above, which gives rise to a genuine issue of material fact in dispute as to whether the conduct of Defendant Quinn was motivated by racial animus and bias towards Plaintiff and whether it served to create a hostile work environment for Plaintiff.

177-178. While Plaintiff had failed the Sergeant's Examination, two other Officers had also failed at the same time. D.P., p. 312. This matter raises a genuine issue of material fact in dispute as to whether Defendants' are attempting to demonstrate that Plaintiff had been given the opportunity to sit for the Sergeant's examination and, nevertheless, had failed it because he did not possess the qualifications and attributes for Sergeant in the initial instance. Defendant Quinn questioned whether Plaintiff had sufficient time because of his suspension to apply for Sergeant's exam. Moreover, the Sergeant's examination was cancelled when Plaintiff signed up.

179-181. Defendant Edgewood also maintains a policy of nondiscrimination in employment in its Police Department, which encompasses, *inter alia*, racial discrimination. Edgewood Borough Police Department Policy and Procedure Manual, Ch. 22, App. H, Nondiscrimination Policy Statement ("Policy Statement"). A copy of Defendant Edgewood's Policy Statement is attached to this Response and marked as Plaintiff's Exhibit No. "21". Additionally, Defendant Wood's Deposition reveals that no diversity or cultural training in the Poice Department took place during his tenure as Chief, D.W., p. 35. Garrett testified that Defendant Edgewood's Police Department provided no orientation or education in diversity for its Police Officers, D.G., p. 56, 77. Additionally, Guierro stated in his Deposition that he had never received formal racial diversity training classes or materials while he was employed for Defendant Edgewood. D.L.G., p. 11.

182. Donna Lewis' ("D. Lewis") testimony in this regard gives rise to a genuine issue of material fact in dispute as to the motive of Ferguson in treating African Americans like her and Plaintiff differently on the basis of their race. By way of further answer, Plaintiff also refers this Honorable Court to his Response to <u>Par. Nos. 44-47</u>.

183. By way of answer, Plaintiff refers this Honorable Court to his Responses to each of the foregoing Paragraphs which give rise to a genuine issue of material fact in dispute as to whether, by their conduct towards Plaintiff, Defendants have displayed racial animus and bias and have created a hostile work environment for Plaintiff.

Respectfully submitted,

By:    */s/John R. Orie, Jr., Esquire*
John R. Orie, Jr., Esquire
Counsel for Plaintiff
Pa. I.D. #21972
2500 Lawyers Building
428 Forbes Avenue
Pittsburgh PA  15219
(412) 281-3180
(412) 232-0813 facsimile

## CERTIFICATE OF SERVICE

I, John R. Orie, Jr., Esquire, hereby certify that on this 9th day of August, 2010, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following counsel of record:

Suzanne B. Merrick, Esquire

THOMAS, THOMAS & HAFER, LLP

One Oxford Centre, Suite 1150

Pittsburgh PA  15219


Mark R. Hamilton, Esquire

Cipriani & Werner

650 Washington Road

Suite 700

Pittsburgh PA  15228


Respectfully submitted,


By:    */s/John R. Orie, Jr., Esquire*
John R. Orie, Jr., Esquire
Counsel for Plaintiff