IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


FREDERICK LIVINGSTON,      )
                    Plaintiff,      )
                                 )
          v.                 )     Civil Action No. 08-812
                                 )
THE BOROUGH OF EDGEWOOD, a      )     Magistrate Judge Lisa Pupo Lenihan
Municipal Corporation; DENNIS      )
HOCKENBERRY, TIMOTHY QUINN,      )
MICHAEL CROW, KURT FERGUSON,      )
and PAUL WOOD, individuals      )
                    Defendants.      )


## MEMORANDUM OPINION AND ORDER
## ON MOTIONS FOR SUMMARY JUDGMENT


## I. CONCLUSION

       For the reasons set forth below, the Court concludes that Defendants' Motions for

Summary Judgment should be granted.

       The Court observes that while the evidence of record is sufficient to reasonably support

findings that (a) Plaintiff, then a 9-1/2 year veteran of the Borough of Edgewood's Police

Department,[1] was treated differently (*e.g.,* was treated less collegially, disfavorably and/or with

---

1. The evidence of record indicates a history of (a) mutual regard/friendship with fellow officers
and (b) neither discipline/reprimands by the employer nor job complaints of any kind by the
Plaintiff.

lesser regard) subsequent to his arrest and upon his reinstatement to active employment as a police officer following his criminal trial and jury acquittal on charges related to alleged sexual assault on his daughter, a minor, and (b) there were tensions between Plaintiff and one or more colleagues in the Police Department, the evidence is insufficient to support a reasonable finding that Plaintiff was, on account of his *race (*or racial animus), subjected to intentional discrimination or a hostile work environment, or that he was subject to retaliation. The evidence is similarly insufficient to support a reasonable finding of liability on any of Plaintiff's additional claims.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

As discussed in this Court's previous Memorandum Opinion on the Defendants' Motion to Dismiss, the initial action *sub judice* was brought on June 12, 2008 by Plaintiff Frederick Livingston ("Livingston") against Defendants for alleged federal civil rights and related state law violations during his employment as an Edgewood Borough police officer.

The action turns on conduct of Edgewood Borough ("the Borough") and its employees (the "Individual Defendants")[2] relating and subsequent to Livingston's arrest and trial for criminal conduct of which he was ultimately acquitted.

---

2.  Defendants Hockenberry and Crow are Borough police officers.  Defendant Quinn was a Borough police officer who resigned following an altercation with Plaintiff for which both were disciplined.   Defendant Wood, now retired, was the Borough's Chief of Police during the relevant time period.  Defendant Ferguson was the Borough Manager.  See Complaint at 2-3.

## A. **Factual History**

The factual history as to which there is some evidence of record is as follows:[3]

Plaintiff, an African-American, has been and continues to be employed as a police officer in the Borough. He was hired in February 1996 and describes himself as "a highly regarded and highly honored Police Officer [with the Borough] because of [his] active involvement with children in the area."[4] He attests that no other Borough police officer has had the level of authority and responsibility which preceded his suspension.[5]

Each of the named Individual Defendants worked with Plaintiff for several years prior to his arrest in August, 2005. Wood had been the Chief of Police since July, 2002, and had recommended Plaintiff's promotion from part-time to full-time status. Hockenberry was a Sergeant, the most senior member of the Police Department, and Plaintiff's immediate supervisor; he had worked with Plaintiff from the time of his employment in 1996. Quinn was

---

3. As detailed at length in Defendants' Reply to Plaintiff's Responsive Concise Statement of Facts, Plaintiff makes quite extensive allegations/assertions as to which he has failed to proffer any evidence. He may not, at this stage of the proceedings, continue to maintain claims on unsupported/conclusory allegations. However much repeated, they are not evidence.

In addition, Plaintiff denies some of Defendants' factual assertions without pointing to specific affirmative evidence of record. Plaintiff also identifies, as in *e.g.*, his deposition, hearsay or speculative assertions made without foundation. Responses should, of course, be supported by admissible evidence and address Defendants' assertions. Cf. Averhart v. Sheahan, 2004 WL 2044281, *1-2 (N.D. Ill. Sept. 10, 2004) (discussing, in grant of summary judgment on correctional officer's Title VII and other claims, inadmissiblity of hearsay testimony and absence of evidentiary support for assertions); id. at *3 (explaining that "factual assertions not properly supported by accurate record citations, and those supported only by hearsay testimony" should be disregarded). Finally, Plaintiff's latest filings provide additional irrelevant information.

4. See Plaintiff's September 4, 2007 EEOC Charge, Ex. DD.

5. See Defendants' Brief in Support of Motion for Summary Judgment ("BSMSJ") at 6.

hired in 1999 and Crow in 2003; both were Patrol Officers with less seniority than Plaintiff. Ferguson had been Borough Manager since 2002.[6]

In early August, 2005, the Allegheny County police (not the Borough police) initiated criminal charges against and arrested Plaintiff for rape, statutory sexual assault, incest, endangering the welfare of children, aggravated indecent assault, indecent assault and corruption of minors. The charges arose from allegations of abuse made by Plaintiff's daughters. The Borough Manager and its Mayor attended the August 22, 2005 preliminary hearing on the criminal charges before the District Magistrate.

Plaintiff was suspended from his police officer position, *with* pay, in early September 2005.[7] Five months later, in mid-February, 2006, the Borough held a Loudermill hearing and extended Plaintiff's suspension without pay.[8]

---

6. The Borough Manager had no disciplinary or supervisory authority over the Police Department. See Appendix to Defendants' BSMSJ.

 The June, 2008 Complaint makes no allegation of racial discrimination or animus on the part of Defendants prior to Plaintiff's arrest, nor is there any evidentiary history of any such allegation in the form of, *e.g.*, inter-Department or EEOC complaint prior to Plaintiff's post-acquittal return to active duty.

7. Cf. 53 P.S. § 752.1 (requiring suspension of a law enforcement officer charged with a felony or serious misdemeanor pending final disposition of the charge or ARD).

8. Under Cleveland Board of Educ. v. Loudermill, 470 U.S. 532 (1985), a public employee is entitled to a *limited* pre-termination hearing, as an initial check against mistaken decisions, that assesses the reasonableness of the charges against the employee. Cf. Gilbert v. Homar, 520 U.S. 924 (1997) (holding that employee was not entitled, under due process clause, to hearing prior to suspension without pay where, as here, suspension was based on felony arrest). Loudermill requires that the employee be given notice of the charges, an explanation of the evidence, and opportunity to present his side of the story. See id.; McDaniels v. Flick, 59 F.3d 446, 454 (3d Cir. 1995).

Plaintiff's criminal trial occurred in September, 2006. Quinn attended the trial at the request of Chief Wood. At the prosecutor's request, Quinn provided the names of individuals with knowledge of Plaintiff's character. Hockenberry, Ferguson, Crow, and Donna Lewis were subpoenaed to testify. Lewis did not testify at trial.[9] Each of the witness Defendants testified quite briefly as to Plaintiff's reputation for truthfulness.[10] Plaintiff was ultimately acquitted by the jury on September 19, 2006.

Plaintiff's pay was reinstated the following day and he was returned to active duty as a Borough Police Officer on November 11, 2006, following the completion of the Borough's

---

9. The parties dispute the reason(s) Ms. Lewis did not testify at the criminal trial. Compare, e.g., Defendants' Brief in Support of Motion for Summary Judgment at 38 (asserting that her name was not on the list subsequently provided/faxed by the prosecutor); Appendix to Defendants' Motion for Summary Judgment, Ex. 9 (deposition of Kurt Ferguson testifying to same); Ex. 6 (Deposition Testimony of Quinn that Donna Lewis informed him she did not intend to honor subpoena and he communicated that to prosecutor at trial the next morning) with id. at Ex. 2 (Plaintiff's Deposition Testimony that Complaint allegation that Quinn influenced prosecutor's decision was premised on his belief that Quinn called the district attorney's office because Quinn "lives next door to him" and they "converse"); id. (Deposition Testimony of Plaintiff that Ferguson and Quinn removed Lewis' subpoena from her hands and told her not to testify when she indicated she would not provide negative character testimony). Cf. Livingston v. Allegheny County, Appeal No. 10-1596, Third Circuit, Brief of Appellant at 18-19 (Plaintiff's assertion in that case that the Allegheny County prosecutors contacted Leslie Lewis, who had been subpoenaed by Defense counsel and was interviewing for a County officer's position, and told her not to testify, and that Lt. Korczyk, an Allegheny County detective, instructed her to "get out of it" and not testify, which she did).

10. See, e.g., Complaint at ¶ 111 (alleging that Defendant Ferguson acted in concert with a conspiracy of perjury "by testifying under oath Plaintiff's reputation for honesty in Edgewood Borough Public Safety Department is not good and Plaintiff's reputation for honesty in Edgewood Borough is mixed"); see also Defendants' Appendix to Motion to Summary Judgment (providing criminal trial testimony of each Defendant, which consisted of approximately 2-3 sentences in response to prosecutor's direction question of general impression of Plaintiff's truthfulness); id. at Ex. 42 (Defendant Crow's testimony that Plaintiff's reputation was as "not completely" honest or truthful); Ex. 43 (Defendant Hockenberry's testimony that Plaintiff's reputation for honesty was "not the greatest" within the Department, but that he'd heard no complaints from anyone in the community and that residents liked Plaintiff).

related internal investigation (as to whether, *e.g.*, Plaintiff had violated department regulations or engaged in conduct unbecoming an officer).[11]  When Plaintiff returned to work, his preferred "daylight" shift (approximately 7:00 a.m. to 3:00 p.m.) had been bid/filled and was unavailable for the remaining six (6) weeks of the year, so he was assigned to the 3:00 p.m. to 11:00 p.m. shift for those weeks, returning to the daylight shift at the beginning of 2007.

Plaintiff describes the difference in his treatment before and after his arrest-related suspension as "in different continents" and "unbelievable".[12]  Extra duties/responsibilities were either phased out or reassigned to others.  Plaintiff's complaints more particularly include that: (1) another officer was assigned the job of "crime prevention officer"; (2) Chief Wood distributed t-shirts to the Woodland Hills School District children for the DARE program in Plaintiff's absence and the DARE officer position was discontinued, assertedly for lack of funding; (3) another officer was assigned to be liaison for the library annual Halloween party; (4) the children's bike rodeo Plaintiff previously worked on was discontinued; (5) another officer was assigned the scheduling of extra details for Giant Eagle and Penn DOT; (6) Hockenberry did not come to assist him when he was evacuating children in response to a Fire Department call at a daycare center across the street from the Police Department,[13] and (7) he was denied approval for

---

11.  The internal investigation was postponed while criminal proceedings were pending to avoid any interference with those proceedings.  See, *e.g.*, Defendants' Reply to Plaintiff's Responsive Concise Statement at 5.

12.  See Brief in Support of Motion for Summary Judgment at 6.

13.  But see Defendants' Appendix to Motion for Summary Judgment, Ex. 1 (Deposition of Plaintiff, noting that Hockenberry was standing in the Borough Office "looking right across the street" at "all the firemen and the kids coming out", and dismissing Hockenberry's response that Plaintiff appeared fine and "didn't ask for backup" as "irrelevant"); id. at Ex. 44 (Chief Wood's

continue...

the third week of what he wished to schedule as a three-week wedding vacation.[14]  Plaintiff was

assigned to less desirable duties, such as abandoned vehicles and DUI case preparations and,

although other officers received new individually-fitted bullet-proofs vests during Plaintiff's

suspension, he was not provided an individual, new vest for two or more years following his

return to active duty.  And Plaintiff alleges that Quinn purposefully did not provide appropriate

computer retraining.[15]

     Within approximately a month of his return to active duty, Plaintiff attempted to recover

back pay for his unpaid suspension.  When the Borough denied his grievance and Plaintiff

---

13.  ...continue
notes of investigation and meeting, indicating there were "at least 20 people" on the scene for this
"smell of smoke" call).  Plaintiff's assertions regarding racially-motivated interference with his
ability to sit for a Sergeant's examination or to obtain a position with the Pennsylvania State
Police, see Plaintiff's Brief in Opposition to the Motion for Summary Judgment at 11, similarly
lack evidentiary foundation.  Cf., e.g., Defendants' Reply to Plaintiff's Responsive Concise
Statement of Facts at 49 (Plaintiff applied for State Police position prior to his criminal charge,
his application was placed on hold, he  was notified of age-related ineligibility by the State
Police), 80 (Plaintiff took Sergeant's examination when it was offered by Department, and
failed); Memorandum Opinion and Order on Partial Motion to Dismiss at 6, n. 12 (discussing
Plaintiff's apparent assertion that he should have been given credit for criminal-trial related
break-in-service and therefore deemed qualified to take Sergeant's examination at earlier time).

14.  Id. at 7.  The Court observes that many of these changes related to programs involving
representation of the Police Department to the community and interaction with minors.  It further
notes that, prior to his publicized arrest and trial on charges of sexual assault on a minor, and
related suspension, Plaintiff indeed appears to have been, as he has characterized himself, "the
face of" the Borough police force.  See Defendants' Appendix to Motion for Summary Judgment,
Ex. 33 (Plaintiff's Deposition Testimony) (describing his multiple roles in children's, schools' and
other community programs in which he represented the Police Department).

15.  See Plaintiff's Memorandum of Law in Opposition to Quinn's Motion for Summary
Judgment at 4 ("Defendant Quinn used the power of his badge to create a hostile work
environment for Plaintiff by taking a longer time to teach Plaintiff about the computer system
than it would have taken with any other police officer.").

requested legal assistance from the Union, Sgt. Hockenberry informed the Union, correctly, that Plaintiff was behind on his dues and therefore did not qualify for Union legal assistance.[16]

The evidence suggests tensions in the Department following Plaintiff's reinstatement - both that Plaintiff was angered by his colleagues' minimal but less-than-fully-supportive trial testimony, and that he was subject to heightened scrutiny (*e.g.*, Plaintiff was advised the first day of his return to work that he did not report sufficiently prior to the start of his shift;[17] he was also cautioned by e-mail by Sgt. Hockenberry on several occasions in 2007 about excessive time on the radio, failing to turn in daily log sheets timely, and "similar infractions").[18] Plaintiff also complains that on one occasion in February 2007 he found his pay envelope torn, that he found some of his daily log sheets in the trash, and that he believed someone was preventing his receipt of mail at work.[19]

In January 27, 2007, approximately two months after his return to work, Plaintiff verbally complained to Chief Wood about a "hostile work environment" but did not provide specifics

---

16. Cf. Complaint ¶ 65 (alleging that Defendant Hockenberry "lied about Plaintiff" to the FOP by "stating Plaintiff was behind in his dues, which he was").

17. The parties dispute whether Plaintiff was "written up" or disciplined by Sgt. Kaskie for this conduct. There is no written evidence of record on this matter. See Defendants' Reply to Plaintiff's Responsive Concise Statement at 72-73. The Court notes that, unlike each of the named Defendants, Sgt. Kaskie did not testify in or otherwise provide information regarding Plaintiff's criminal trial, and she was not made a party to this action.

18. See Defendants' BSMSJ at 8.

19. See Defendants' Appendix to Motion for Summary Judgment, Ex. 1 (Plaintiff's Deposition Testimony, discussion of exhibit regarding February, 2007 complaints by Plaintiff that his pay envelope was torn, that he felt Quinn and Hockenberry did not want him there any more, and that he no longer felt part of the agency); cf. id. at Ex. 2 (Plaintiff's Deposition Testimony, concluding that his complaints concerning log sheets and paychecks "were frivolous").

suggestive of any race-based, as opposed to criminal-charge-based, discord.[20]  In March, 2007, he again complained to Chief Wood in writing about "discriminatory practices" such as Hockenberry's refusal to speak/avoidance of contact with him and communication through others and e-mails, and Hockenberry's talking about Plaintiff with others.[21]  Chief Wood then held a meeting with Plaintiff, Hockenberry, and the Mayor, but no evidence for an investigation of race-based motive or discrimination was provided. See, *e.g.*, Plaintiff's Response to Concise Statement of Material Facts, Ex. 2 (Deposition Testimony of Wood, explaining that Plaintiff's complaints did not raise any allegations referencing *race*); Defendants' Appendix to Motion for Summary Judgment, Ex. 2 (Plaintiff's Deposition Testimony, asserting that he did not believe he provided specific information supportive of complaints as requested by Wood because he realized Wood had a "friendship" with Hockenberry and they were "working as a team"); id. (confirming that Plaintiff (a) continued to decline to provide specific facts in support of

---

20.  See id. (Plaintiff's Deposition Testimony, discussion of January, 2007 meeting, Plaintiff's statements that neither Hockenberry nor Plaintiff were speaking to each other, and Wood's direction that Plaintiff should sit down and speak with Hockenberry); id. at Ex. 36 (Chief Wood's notes of meeting, including Plaintiff's animosity towards Crow, Ferguson and Hockenberry, who "came down and lied about him at the Court" and Chief's (a) direction that he needed to "move on with his life" and "work with" those people and (b) request that he provide specifics as to any complaints of being talked about or a hostile environment).

21.  See id., Ex. 2 (Plaintiff's Deposition Testimony, identifying basis for asserting that Hockenberry's actions were discriminatory as "[h]e simply treated me completely different than every other officer there" and suggesting that although they had been "very good friends", Hockenberry became threatened by Livingston's power in the department); id, at Ex. 37 (Plaintiff's March 27, 2007 Formal Complaint to Chief Wood and Mayor Davin).

allegations of discrimination and hostile work environment at the April meeting, saying he had promised not to, but (b) complained that colleagues were talking about him behind his back and that individuals he believed were friends (such as Ferguson) had gone to "court and lied about him"); Defendants' Appendix to Motion for Summary Judgment, Ex. 44 (Chief Wood's Notes of April 11, 2007 meeting) (same).

In August, 2007, Plaintiff filed an EEOC Charge under Title VII, asserting race discrimination and retaliation. The Charge alleged that the discrimination commenced September 1, 2005 (the date Plaintiff's paid criminal-arrest-related leave began). It alleged that the Borough failed to "investigate the spurious [criminal] charges filed against" Plaintiff because they intended to terminate him "because of [his] race" and violated his "Civil Rights by holding a sham Loudermill Hearing." It further complained that his colleagues had "defamed" him and "spread false malicious rumors" about him "with the intent to convict" him, and had "filed pretextual complaints" against him; that the Borough placed him on unpaid leave until November 14, 2006, denied his request for backpay, and took job duties away from him; and that he was "shunned at work" with no reason given. Plaintiff alleged that unspecified "racial slurs" were made about him by Ferguson, that the Borough took unspecified "racially improper actions", and that Quinn "tampered with the trial by [providing] negative character references" to have him convicted and "prepared a computer drawing of a black man behind bars with a free Fred comment." EEOC Charge at 2, Ex. DD.[22] His EEOC Charge concludes with the allegation that

---

22. The Borough attests that it had a computer administrator search the computers for the drawing, but none was found. See Defendants' Reply to Plaintiff's Responsive Concise Statement at 46.

"[s]ince [his] return to work, [the Borough] ha[d] retaliated against [him] and harassed [him]

because of [his] race." Id. at 3.

On September 3, 2007, Plaintiff verbally complained to Chief Wood that Hockenberry

was "picking" on him and that Leslie Lewis, an African-American employed as a Borough Police

Officer for over five (5) years, had been discriminated against,[23] as had Troy Garrett, an African-

American who was also employed as a part-time Officer.[24] Wood counseled Plaintiff regarding

_____

23. Leslie Lewis was employed from September 2000 until January, 2006, when she resigned.
Her testimony is that she believes Hockenberry discriminated against her owing to her gender
and race, and that she believes she was discriminated against because she received no backup on
traffic stops, received no exit interview, and was subjected to racial epithets. But more
specifically, Lewis testified that Hockenberry made sexist remarks about female officer Kaskie,
she once overheard Quinn using racially offensive language which she believed was in reference
to herself, and that employees named Gerald Mikelonis and Michael Bowen also used race-based
language and she believed them to be racist. (None of the conduct identified was asserted to have
occurred in Plaintiff's presence.) She testified she "never heard [Hockenberry] talk about her".
The only specific assertedly racist act Lewis attributed to Hockenberry was his telling Plaintiff
that he should "stay away from [her]" because "she's trouble", and she testified that she never
heard him say anything overtly racist. Lewis also testified to no knowledge of racist statements
on the parts of Wood, Ferguson or Crow. There is no evidence of record regarding, *e.g.*, any
formal internal or EEOC allegation of discrimination by Ms. Lewis during her five (5) years
employment. See Plaintiff's Response to Concise Statement of Material Facts at Ex. 13
(Deposition of Leslie Lewis); Defendants' BSMSJ at 9-10; Appendix to Defendants' Motion for
Summary Judgment, Ex. 16 (Deposition of Leslie Lewis).

24. Troy Garrett's testimony is that he heard Hockenberry make derogatory comments about the
abilities of female police officers but no such statements that were race-based, and that he
believed Hockenberry discriminated against Leslie Lewis and felt she should not have the job
when a man could have it. Garrett speculated that Hockenberry's discrimination against Lewis
may have also been race-based because if he was making discriminatory remarks about women,
"there was a good chance" he was "making that same comment about African Americans", but
Garrett had neither heard nor been told of any such race-based comments. He also testified to
observing no racist language or conduct by Hockenberry, Wood, Ferguson or Crow. Garrett
testified that although he believed the Department engaged in racial profiling with regard to
traffic stops when he first joined, he could not say that practice had continued thereafter, and he
observed no overt race-based conduct with regarding to the Borough officers/employees. When
asked to identify individuals whom he knew to have engaged in covert racist remarks/conduct,

continue...

his dispute with Hockenberry regarding the manner in which the latter directed that Plaintiff turn in time sheets (*i.e.*, that they should be turned in to Plaintiff's supervisor, Hockenberry, rather than slid under Chief Wood's door for hand-off to Hockenberry, as Plaintiff had been doing), Plaintiff's feelings regarding Hockenberry's avoidance of him since his return to work, and his response to requests for information in support of allegations of "harassment" with only assertions that he had officers who "would testify when he went to court." Defendants' Appendix to Motion for Summary Judgment, Ex. 46 (Wood's Notes of Sept. 3, 2007 meeting).

Because Plaintiff had voiced complaints regarding his post-reinstatement treatment by Hockenberry, Chief Wood decided to complete Plaintiff's annual performance review (rather than Hockenberry, who was Plaintiff's immediate supervisor). Wood, who was in the process of retiring and relocating to South Carolina, initially forgot to complete the review and, as a result, it was not provided until early 2008. This delay did not affect Plaintiff's pay rate and had no other adverse job effect.

As noted above, the initial Complaint in this case was filed in June, 2008.

In September, 2009, Plaintiff complained to the new Chief, Robert Payne, of a threatened assault by Quinn and his past "insensitive and racial remarks".[25] Payne's investigation indicated

_____

24. ...continue
Garrett identified only Quinn and another non-Defendant officer who departed the force some time ago. He also testified that Hockenberry discriminated against him because he was a part-time officer and he once heard Hockenberry disparage part-time officers as unreliable. See Plaintiff's Response to Concise Statement of Material Facts, Ex. 9 (Deposition of Garrett at 17); Appendix to Defendants' Motion for Summary Judgment, Ex. 12 (Deposition of Garrett).

25. See Appendix to Defendants' Motion for Summary Judgment, Ex. 25 (August 30, 2009 correspondence from Plaintiff to Payne, also complaining of Quinn's "inflammatory" and "backdoor" comments, "designed to cause significant problems with fellow officer's [*sic*] and
continue...

that both Quinn and Plaintiff had exchanged threatening words and both received charges,[26]

Loudermill hearings regarding rules violations, letters of reprimand, and directions to anger

management classes at the Borough's expense.  Shortly thereafter, Payne also obtained - through

the deposition testimony of Wilkinsburg Police Officer Don Hamlin in this case - information

regarding Quinn's creation, in late 2006, of a computer image of Plaintiff behind bars and use of

racially offensive language in reference to Plaintiff.  When Hamlin's testimony was partially

corroborated, Quinn was suspended without pay and submitted his resignation in December,

2009.  Plaintiff continued in employment, but failed to comply with his discipline by attending

anger management classes.[27]

## B.  **Procedural History**

This Court previously concluded that neither (a) Plaintiff's federal claims of violation of

his First, Fifth, Sixth, or Fourteenth Amendment due process rights, nor (b) Plaintiff's state law

claims of intentional infliction of emotional distress, set forth allegations sufficient to withstand

---

25.  ...continue
citizens in the community").  Plaintiff's deposition testimony is that this refers to Quinn's
continuing postulations regarding the allegations made against Plaintiff by his daughters.

26.  See id. at Ex. 26 (Letter of Reprimand regarding incident). Cf. Plaintiff's Response to
Concise Statement of Material Facts, Ex. 5 (Deposition of Keith Nugent, attesting that Plaintiff
and Quinn didn't like each other and had exchanged threats); id. at Ex. 9 (Deposition of Garrett,
testifying that Quinn's jealousy/animosity toward Plaintiff initially arose from Plaintiff's
obtaining seniority over Quinn on the basis of full-time position test scores - derived in part from
more favorable interview scores obtain by Plaintiff, which Quinn attributed to Plaintiff's personal
friendships with supervisors; but that Garrett also came to believe some of Quinn's feelings were
race based).

27.  See Plaintiff's Supplement to Response (indicating that Plaintiff had not complied with class
within six-month period given, and including Plaintiff's counsel's letter that - on advice of that
counsel - he had no intention of doing so).

Defendants' Partial Motion to Dismiss, which was granted in its entirety when Plaintiff declined leave to amend his Complaint to incorporate further allegations. Plaintiff's Fourteenth Amendment equal protection claim, § 1985 claim, and defamation and state law conspiracy claims were not challenged on Motion to Dismiss and so remained. See Brief in Support of Motion to Dismiss at 4.

Although Plaintiff declined invitation to amend his Complaint, he shortly thereafter commenced a second civil action against the same Defendants in State Court raising new allegations under Title VII, 42 U.S.C. § 2000(e) *et seq.*, of intentional discrimination (disparate treatment), hostile work environment, and retaliation.[28] The case was removed to this Court and consolidated with the initial action in 2009.

Currently pending are Motions for Summary Judgment filed by (1) the Borough, Dennis Hockenberry, Michael Crow, Kurt Ferguson and Paul Wood; and (2) Timothy Quinn.

## III. STANDARD ON SUMMARY JUDGMENT

Summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). All evidentiary inferences are drawn and all

---

28. Although this Complaint named the Borough's Council members as additional defendants, Plaintiff later voluntarily withdrew claims against them. See Defendants' BSMSJ at 2.

doubts resolved in favor of the non-moving party.  See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The moving party has the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  The party opposing the motion, however, cannot rely merely upon bare assertions, conclusory allegations, or suspicions to support his claim; he "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita, 475 U.S. at 586, and must produce more than a "mere scintilla" of evidence to demonstrate a genuine issue of material fact. See Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir.1992). See also Celotex, 477 U.S. at 324 (observing that Rule 56(e) permits a summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves).

A motion for summary judgment will not be defeated by the mere existence of some disputed facts.  See Anderson, 477 U.S. at 247-48.  The inquiry to be made is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).[29]  The non-moving party "must be able to produce evidence that 'when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor.'"  SEC v. Hughes Capital Corp., 124 F.3d 449, 452 (3d Cir. 1997) (quoting Kline v. First W. Gov't Sec., 24 F.3d 480, 484 (3d Cir. 1994)).  If the non-moving party fails to present evidence sufficient to establish an "element essential to that party's case, and on which

---

29.  See also id. (holding that there is no genuine issue of material fact if the evidence is of insufficient caliber or quantity to allow a rational jury to find for the nonmoving party).

that party will bear the burden of proof at trial", summary judgment is appropriate.  <u>Celotex</u>, 477

U.S. at 322.  One of the principal purposes of the summary judgment rule is to dispose of

factually unsupported claims or defenses.  <u>Id.</u> at 323-24.


**IV.  <u>ANALYSIS</u>**

**A.  Claims Under Title VII for Disparate Treatment, Hostile Work Environment, and/or Retaliation**

To make out a claim of racially disparate treatment under Title VII, 42 U.S.C. § 2000e,

Plaintiff must demonstrate *prima facie* evidence of intentional discrimination through direct or

indirect evidence that he (1) belongs to a racial minority; (2) was qualified for the position; (3)

was subjected to an adverse employment action; and (4) was treated less favorably that similarly

situated persons not members of his protected class or that the circumstances of the adverse

action give rise to an inference of discrimination.  <u>See</u>, *e.g.*, <u>Sarullo v. USPS</u>, 352 F.3d 789, 797

(3d Cir. 2003).  Plaintiff may satisfy his initial burden of proof by offering direct evidence of

discriminatory intent (*e.g.*, evidence of conduct or statements by persons involved in the decision

making process, related to that process, and directly reflecting the alleged motivation), or may

indirectly demonstrate such intent under the <u>McDonnell Douglas</u> framework. <u>McDonnell</u>

<u>Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  Under the indirect method, where Defendants

counter with legitimate nondiscriminatory reasons for their actions, Plaintiff must then show that

those reasons were pretextual.  Id. at 751; see also Fuentes v. Perskie, 32 F.3d 759 (3d Cir. 1994).[30]

Plaintiff has clearly met the first two criteria.  As to the third, adverse employment action, as discussed in Defendants' Brief in Support of Motion for Summary Judgment, Plaintiff's assertions that he is entitled to equitable tolling or application of the continuing violations doctrine as to his disparate treatment claim are without merit.  See generally O'Connor v. City of Newark, 440 F.3d 125 (3d Cir. 2006) (citing Nat'l Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002) (establishing distinction between individually-actionable, discrete acts subject to statute of limitations, such as wrongful suspension, and those within scope of continuing violations doctrine)). To the contrary, it is limited to acts/events occurring within the 300 days preceding the filing of his EEOC charge (i.e., on/after October 14, 2006) and could therefore encompass neither Plaintiff's August, 2005 suspension with pay nor his February 2006 suspension without it.  See Defendants' BSMSJ at 15-17.  However, because other employment actions, such as the unfavorable changes in Plaintiff's job responsibilities or his subjection to heightened scrutiny upon his return to active duty in November, 2006, were potentially "serious and tangible enough to alter [Plaintiff's] compensation, terms, conditions, or privileges of employment", this Court concludes that Plaintiff may also meet the third criteria. Tucker v. Merck & Co., 131 Fed. Appx. 852, 855 (3d Cir. 2005) (emphasis added); Storey v. Burns Int'l Sec. Servs., 390 F.3d 760, 764 (3d Cir. 2004).

---

30.  Cf. Egonmwan v. Cook County Sheriff's Dept., 602 F.3d 845  (7th Cir. 2010) (affirming summary judgment on discrimination claims of African American correctional officer who was terminated following Department's investigation regarding charges of custodial sexual misconduct, but acquitted post-trial on criminal charges).

It is on the fourth criteria that Plaintiff's case clearly fails, for Plaintiff has not produced evidence sufficient to reasonably support a finding either that (a) similarly situated individuals who were not African American were treated differently or (b) the circumstances support an inference of intentional racial discrimination. Plaintiff has proffered nothing more than his own speculation that his post-arrest and post-reinstatement treatment would have been different were he not African American. He proffers no evidence of reasonably similarly situated individuals (*e.g.*, in circumstances of comparable seriousness) treated differently. The circumstances painted by the evidence of record strongly suggest that Plaintiff's post-reinstatement job duties and inter-personal relationships within the Department were markedly different from the closely-collegial, high-profile and highly-regarded professional career Plaintiff had enjoyed in the Borough for almost ten (10) years prior to his arrest. They also strongly support an inference that these changes related to his criminal prosecution, and the personal tensions arising from his colleague's participation/responses.[31]

Could any of Plaintiff's post-acquittal employment circumstances be reasonably found to have been unfair and/or unfortunate if as alleged? Yes. But reasonably attributable to racial

---

31. See, *e.g.*, Defendants' Appendix to Motion for Summary Judgment, Ex. 2 (Plaintiff's Deposition Testimony, responding to request to identify "what racist comments [Plaintiff] reported to [Chief Wood]" with "just the overall treatment of me in general", specifying complaints that he was treated differently on his return to work and did not receive recognition/award, had job duties taken away and replaced by less desirable duties, lost his authority in the department (which had assertedly been the greatest of any officer in the Borough, then or since), lost his "beautiful blue unmarked car", wasn't given a personally fitted vest, and had "everything taken away" when he "[came] back to work"); id. (responding, in request to repeated request to identify racist comments reported, that he "reported more so the discriminatory treatment of [himself]"); id. (explaining that Plaintiff was "humiliated" when sent on duty time to purchase groceries for an open house but was "no longer good enough" to run that program, as he had before his arrest).

discrimination/animus on the part of the employer under Title VII on the record before this Court?  No.  Cf. Defendants' BSMSJ at 32 ("A jury could not reasonably infer on the basis of this evidence that the difference in Plaintiff's treatment prior to his suspension and after his suspension was motivated by his race.  His race was a constant.  Other circumstances changed.").  Similarly, under the McDonnell-Douglas framework, Plaintiff has not adduced evidence sufficient to reasonably discredit the attested non-discriminatory reasons for employment actions (*e.g.*, implausibilities or contradictions), and from which the fact finder could reasonably believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of any employment action.[32]

Plaintiff's Title VII claims premised on a hostile work environment fail for similar reasons.  A hostile environment claim requires that Plaintiff demonstrate (a) intentional race-based discrimination; (b) that was "*severe or pervasive*"; (3) detrimentally affected him and would so affect a reasonable person in his position; and (4) that there is a basis for the employer to be held vicariously liable.  Thus, this claim too requires evidence of intentional discrimination and a causal nexus between Plaintiff's race and the action(s) complained of.  Plaintiff has simply

---

32.  Cf. Miller v. Maddox, 51 F.Supp.2d 1176 (D. Kan. 1999) (granting summary judgment on Title VII race discrimination, conspiracy, and other claims brought by police officer investigated on charges of domestic/sexual assault, placed on leave, and transferred to less prestigious job duties/conditions); Blanding v. Pennsylvania State Police, 12 F.3d 1303 (3d Cir. 1994) (affirming summary judgment on Title VII claims of police officer discharged following internal investigation into domestic altercation/assault); Egonmwan v. Cook County Sheriff's Dept., 602 F.3d 845 (7th Cir. 2010) (affirming summary judgment on discrimination claims of police officer terminated on testimony and other evidence of sexual misconduct, but acquitted of criminal sexual misconduct charges under "higher burden of proof at trial"); id. at 851-52 (noting that Plaintiff failed to evidence either (a) that similarly situated non-African-Americans were treated differently or (b) that defendant's basis for actions was pretextual or dishonest).

failed to produce evidence sufficient to reasonably support an inference of *racial discrimination*, as opposed to evidence of (a) criminal-suspicion-based prejudice (i) arising concurrently with Plaintiff's criminal arrest/trial on charges of a particularly disturbing nature against one in a position of both authority and public trust, and (ii) not fully alleviated by his post-trial acquittal on those charges,[33] and (b) personal tensions and resentments between Plaintiff and some colleagues following their testimony in his criminal trial.[34]  See Moore v. Grove North America,

_____

33.  See, *e.g.*, Plaintiff's Response to Concise Statement of Material Facts, Ex. 15 (Deposition Testimony of Officer Libel, expressing regret at impact of criminal charges/trial on relationships among Officers who were friends and worked together, explaining that on being told that evidence indicated Plaintiff's guilt, "part of [him] felt [Plaintiff] might be guilty . . . because he didn't know Plaintiff had children, and that once [he] found out what the charges were, and that [Plaintiff's] own daughter had brought them against [him], it's pretty harsh stuff"); id. at Ex. 18 (Deposition Testimony of Crow testifying that belief in Plaintiff's innocence was challenged when case proceeded through various stages to criminal trial on strength of evidence); id. at Ex. 20 (Deposition Testimony of Heidi McDonald, stating that initial belief in Plaintiff's innocence was influenced when Borough received, in connection with investigation for violation of regulations/code of conduct, documentation from hospital psychologists' evaluations of Plaintiff's daughter indicating evidence of abuse).

34.  See, *e.g.*, id. at Ex. 15 (explaining that when Plaintiff returned to active duty he "didn't like - and I guess for obvious reasons - anybody that had come down" and given adverse character testimony); Defendants' Appendix to Motion for Summary Judgment, Ex. 1 (Plaintiff's Deposition Testimony, including discussion of his typed notes of Ferguson's attempts to initiate conversation with Plaintiff on his return to work in November, 2006, Plaintiff's walking away and telling Ferguson their "friendship was [over]", and that Ferguson should not touch Plaintiff as long as he lived because he "tried to take [Plaintiff's] life away from him" by testifying); id. at Ex. 34 (December 4, 2006 Notes from Livingston to Chief Wood including Plaintiff's refusal to speak with Ferguson, who "asked for five minutes . . . to explain his actions [in] testifying" and "waited around [to speak to Plaintiff until] midnight or so"); id. (explaining that Plaintiff later told Ferguson he was a liar who should "stop trying to justify his actions"); id. at Ex. 2 (Plaintiff's Deposition Testimony, regarding his non-participation in post-shift officers' "round table" discussions: "I'm not going to participate in a hostile environment when someone tried to put me in prison for the rest of my life."); Defendants' Appendix to Motion for Summary Judgment, Ex. 2 (Plaintiff's Deposition Testimony, asserting that Crow created a hostile work environment on Plaintiff's return to work because they "didn't speak at all" and it was "very tough working with [Crow] based on what had happened"); id. (stating that when Crow told Plaintiff he would
continue...

927 F.Supp. 824, 829 (M.D. Pa. 1996) ("If the nature of an employee's environment, however unpleasant, is not due to [membership in a protected class, he] has not been the victim of [unlawful discrimination] as a result of that environment."); Boykin v. Bloomsburg Univ. of Pa., 893 F.Supp. 378 (M.D. Pa. 1995) (noting that Title VII does not protect employees from unfair employment actions, but only from employment actions motivated by person's race or other protected status).[35]

_____

34. ...continue
always back him up on a call, Plaintiff expressed disbelief, asking "do you really know how that sounds coming from you . . . when I sat in a Defendant's chair and watched you walk into a courtroom in uniform?"); id. (responding to question regarding *why Crow was named as a defendant in this action*: "things could come to me later that occurred, but that is the biggest, biggest, biggest issue that sticks out in my mind that [Crow] got up there and deliberately lied [in Plaintiff's criminal trial]").

    The Court observes that a significant portion of Plaintiff's pleadings continues to reiterate complaints and general allegations regarding his criminal prosecution and the Defendants' participation therein.  See, *e.g.*, Plaintiff's Brief in Opposition to Motion for Summary Judgment at 2 (asserting that Defendants were "aware that the charges against Plaintiff were unfounded"); 3 (asserting that Defendants conducted a "sham" Loudermill hearing to deprive him of the ability to defend himself); id. (asserting that they conspired in "defaming him, offering false testimony about him, obstructing justice and tampering with witnesses"); id. at 10 (asserting that they "malign[ed] Plaintiff's character in view of the criminal charges brought against him").

35. Cf. Plaintiff's Response to Concise Statement, Ex. 9 (Deposition of Garrett, testifying that Hockenberry appeared to be Plaintiff's friend prior to his arrest, but appeared to have decided that he didn't want to have anything more to do with Plaintiff thereafter); Defendants' Appendix to Motion for Summary Judgment, Ex. 2 (Plaintiff's Deposition Testimony that Hockenberry's "hatred was evident from the day that [Plaintiff] was cleared" of criminal charges); id. at Ex. 1 (Plaintiff's Deposition Testimony asserting that Ferguson created a "hostile work environment" by telling Public Works employee Larry Guerriero to "stay away from" him, and alleging that he "was isolated"); id. at Ex. 2 (Plaintiff's Deposition Testimony that Quinn created a "hostile work environment" because he didn't want Plaintiff "back at work" and wanted "to be the senior patrol officer" and therefore wouldn't help Plaintiff with anything).

Moreover, the isolated evidence of Borough employee or co-worker conduct that could (even remotely) support an inference of racial animus on the part of those actors[36] is neither

---

36. The extensive factual record in this case includes the depositions of numerous Borough employees and former employees, all of which have been carefully reviewed by the Court for evidence against the Defendants.

In addition to the testimony discussed *supra* at nn. 23-24, Plaintiff has proffered evidence from two employees, Donna Lewis and Larry Guerrerio, that the Borough Manager, Ferguson, who had no authority over the Police Department, (a) played a CD of an African American comedian Dave Chapelle who used "the 'N' word" in his routine; (b) used that word himself (not in Plaintiff's presence); and (c) made a derogatory, race-based comment about Ms. Lewis's diet (*i.e.*, that she ate chicken and drank "40s"; the comment was not made in Plaintiff's presence). He also asserts that Ferguson once asked Plaintiff if he had heard a detainee refer to Plaintiff as a "black Denzel Washington look-alike cop". Plaintiff also complains that a Borough Council member gave him gifts in a show of post-arrest support that included a card, cookies, books and a music CD titled "Cheer Yo Ass Up." The Court notes that this Council member, and two others, wrote a letter in support of Plaintiff, and in protest of a published article regarding his arrest (which they felt assumed guilt), which was published in the Pittsburgh Post Gazette. See Defendants' Reply to Plaintiff's Responsive Concise Statement at 76.

He has also proffered evidence from two employees, Mike Libell and Mark Ratajeski, as well as Wilkinsburg police officer Don Hamlin, that his co-worker Quinn (who had less seniority and no supervisory authority) "used the 'N' word" in reference to Plaintiff but not in his presence. Don Hamlin's testimony was also that Quinn created a computer image of Plaintiff behind bars with the caption "Free Fred" (this image was never seen by Plaintiff ). See Plaintiff's Response to Concise Statement of Material Facts, Ex. 7 (Deposition of Hamlin, including testimony that Quinn said he believed Plaintiff was guilty of child molestation, and used offensive language in speaking to Hamlin, including racial epithets). As discussed, *supra*, Quinn resigned after the Borough learned of his use of racial epithets and subsequent altercation with Plaintiff, and disciplined Quinn for his conduct. (The Court observes that Quinn's use of racial epithets in reference to Plaintiff was not alleged in Plaintiff's pre-Fall 2009 written complaints or EEOC charge.) Cf. Defendants' Appendix to Motion for Summary Judgment, Ex. 1 (Plaintiff's Deposition testimony that Quinn "would never" use the racial epithet "to Plaintiff's face"). See also Appendix to Defendants' Motion for Summary Judgment, Ex. 2 (Plaintiff's Deposition Testimony identifying only Officer Nugent as individual known to have seen the "Free Fred" image); id. at Ex. 14 (Deposition Testimony of Nugent, stating that he and Officer Libell saw it very quickly on a computer screen once and nothing further, and he had never heard a race-based remark in the presence of an African American in the Department).

continue...

(a) so severe or pervasive to cause reasonable detrimental effect upon Plaintiff (*e.g.*, it was not heard by and/or directed to Plaintiff)[37] nor (b) conduct for which the Borough could, absent more (*e.g.*, evidence of the employer's express or inferential sanction by failure to take remedial action against known harassment), reasonably be held liable. See, *e.g.*, Kunin v. Sears Roebuck and Co., 175 F.3d 289, 293 (3d Cir. 1999). Nor is the evidence sufficient to support a reasonable inference of an underlying intent to discriminate on the part of Defendants who committed facially neutral employment acts (such as Chief Wood). Cf. Caver v. City of Trenton, 420 F.3d 243, 263 (3d Cir. 2005); Defendants' BSMSJ at 31-32; Griffith v. City of Des Moines, 2003 WL 21976027, *14 (noting, in granting summary judgment on Title VII and § 1983 race discrimination claims of Fire Department employee charged with sexual assault on minor and placed on probation following plea to lesser charges, that evidence reflected plaintiff's anger on

---

36. ...continue
    Cf. Miller v. Maddox, 51 F.Supp.2d 1176 (D. Kan. 1999) (noting use of racial slurs in reference to Plaintiff by member of City Commission with no authority over Plaintiff, and history of personal animosity stemming from Plaintiff's arrest of his brother); Blanding v. Pennsylvania State Police, 12 F.3d 1303, 1308 (3d Cir. 1994) (noting that personal animosity or racial bias of officer investigating plaintiff's domestic altercation was insufficient to support Title VII claim where officer played no role in any adverse employment decisions/actions).

37. Cf. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment . . . is beyond Title VII's purview."); Page v. Trs. of the Univ of Pa., 222 Fed. Appx. 144, 146 (3d Cir. 2007) (looking to "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance"); Preston v. Bell Atl. Network Servs., 1997 U.S. Dist. LEXIS 358 (E.D. Pa. 1997) (noting that, while plaintiff identified a few overtly race-related acts, many alleged acts of harassment were "unsupported by any evidence that . . . such actions were based on racial animus" and instead appeared to result from other causes). Cf also Alfono v. Costello, 294 F.3d 365, 374 (2d Cir. 2002) (holding it "axiomatic" that claim of hostile work environment must show conduct took place because of status (*e.g.*, race)).

reinstatement and mutual personal tensions, and did not reflect "anything to do with race" in interactions with, or decisions by, those in positions of authority).[38]

Finally, the relevant provisions of Title VII prohibit intentional retaliation against an employee because he engaged in the protected conduct of (a) opposing a practice prohibited by Title VII or (b) filing a charge, testifying, assisting or otherwise participating in an investigation, proceeding, or hearing pursuant to Title VII.  Plaintiff must demonstrate that (a) he engaged in protected opposition to statutorily prohibited discrimination, and that (b) subsequent to or contemporaneous therewith, (c) the employer took materially adverse action against him; and (d) there was a causal connection between the adverse action and the protected activity.  42 U.S.C. § 2000e.  See, e.g., Fogleman v. Mercy Hospital, Inc., 283 F.3d 561, 567-78 (3d Cir. 2002); Burlington Nortern & Santa Fe Railway Co. v. White, 548 U.S. 53 (2006).  Plaintiff alleges that Defendants "retaliated" against him for his charge of criminal conduct in August, 2005.  See June, 2008 Complaint, Count II.   As Defendants duly note, that cannot support a claim of retaliation under Title VII.  See Defendants' BSMSJ at 42-43.[39]  To the extent Plaintiff now attempts to premise a retaliation claim on his complaints to Chief Wood of unspecified "hostile work environment" or "discriminatory practices" in early 2007, or his August, 2007 EEOC

---

38.  Cf. also Averhart v. Sheahan, 2004 WL 2044281, *5, n. 9  (N.D. Ill. Sept. 10, 2004) (observing, in granting summary judgment on Title VII claims, that "isolated and attenuated statements" of individuals as to which plaintiff made "little or no effort to prove" decisionmaking or other authority/influence could not establish discriminatory intent of defendants).

39.  And as they also note, Plaintiff's EEOC charge, which alleges that Defendants "retaliated against [him] and harassed [him] because of [his] race" and "retaliated against [him] by creating a hostile work environment because of [his] race" also failed to state a cognizable Title VII retaliation claim.  Defendants' BSMSJ at 42, n. 8.

charge, or subsequent complaints alleging race-based misconduct, the Court concurs that (1) the context and proffered specifics of these complaints indicated that they turned on tensions and/or animosities resulting from factors other than Plaintiff's race, *i.e.*, his criminal arrest and trial and the Defendant colleagues' testimony therein; (2) the litany of differences in regard/esteem and employment circumstances of which Plaintiff complains began, he himself alleges, upon his arrest and continued with changes (including, *e.g.*, re-assignment or discontinuance of his duties) implemented upon his return to active duty in November, 2006 (*i.e.*, *before* any asserted conduct in opposition to a purported race-based animus);[40] and (3) there is simply insufficient evidence from which the fact finder could reasonably infer a causal connection between any material adverse action and retaliation for conduct protected under Title VII. See Defendants' BSMSJ at 44-47. See also, *e.g.*, LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 232-33 (3d Cir. 2007).[41]

For these reasons, the Defendant employer, to whom Title VII applies, is entitled to summary judgment on Plaintiff's claims under Title VII. Cf. Washington v. City of New York, 2009 WL 1585947 (S.D.N.Y. June 5, 2009) (granting summary judgment on Title VII race discrimination and retaliation claims of African-American police detective charged with assault on alleged paramour and sexual abuse of her minor daughter, suspended and placed on modified

---

40. Cf. Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87 (2d Cir. 2001) (holding that plaintiff cannot rely on temporal proximity of alleged retaliation where adverse job actions commenced prior to protected activity); McKinney v. Dept. of Transportation, 2009 WL 4730482, *19 (D. Conn. Dec. 2, 2009) (holding reasonable jury could not conclude adverse actions occurring before and after filing of administrative complaint were due to such filing).

41. Cf. also B. Lindemann & P. Grossman, Employment Discrimination Law 669 (3d ed. 1996) (noting distinction of personal tensions, and "antipathy" and "snubbing" by supervisors and/or coworkers, which are not actionable).

assignment); id. at *7 (observing that plaintiff who filed claims against City and individual officers allegedly involved in arrest and related proceedings failed to show "circumstances giving rise to an inference of discrimination", conceded that no defendant ever "said something to [him] which evidenced" racial animus, "offered nothing other than speculation that Defendant's actions were motivated by race-based animus" and failed to show "that the Defendant's non-discriminatory reasons", including "the serious allegations . . . a non-party leveled against him . . . were pretextual"); id. at *3-5 (noting that although criminal charges were dropped following grand jury hearing at which plaintiff's counsel introduced cell phone recordings incriminating paramour, probable cause for arrest existed in form of testimony of accuser and testimony and medical examination of minor daughter). Cf. also Boykin v. Bloomsburg Univ. of Pennsylvania, 893 F.Supp. 378 (M.D. Pa. 1995) (noting, in granting summary judgment, that defendants' actions taken through criminal investigation, suspension, and publicity surrounding arrest of employee charged with rape did not implicate racial discrimination and/or were not actionable under claims made).

## B. Claims for Denial of Equal Protection - 42 U.S.C. § 1983

Section 1983 does not itself confer substantive rights, but provides a remedy for redress when a Constitutionally-protected right has been violated under the color of state law. See Oklahoma City v. Tuttle, 471 U.S. 808, 816 (1985); Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997). Claims for a violation of the Fourteenth Amendment's rights of equal protection, under 42 U.S.C. § 1983, like those under Title VII, require that Plaintiff demonstrate "purposeful discrimination". Andrews v. City of Philadelphia, 895 F.2d 1469, 1478 (3d Cir. 1990).

To establish a § 1983 action against an Individual Defendant, Plaintiff must show that the Defendant personally acted under color of law to cause, or had actual knowledge of and acquiesced in, an alleged intentional depravation of a constitutionally-protected interest. See Hafer v. Melo, 502 U.S. 21, 25 (1991); McQueen v. Philadelphia Housing Authority, 2003 U.S. Dist. LEXIS 19844, *5 (E.D. Pa. 2003). To establish such an action against the Borough, a municipal entity, Plaintiff must show that the depravation was caused by official policy, custom or usage, and deliberate conduct. See Monell v. Dept. of Social Servs., 436 U.S. 658 (1978) (rejecting municipal liability by virtue of *respondeat superior* and announcing standard); Berg v. County of Allegheny, 219 F.3d 261, 275 (3d Cir. 2000); Simmons v. City of Philadelphia, 947 F.2d 1042 (3d Cir. 1991). Plaintiff must also, to impose liability, demonstrate a plausible nexus of causation between an unlawful policy or custom and the injuries alleged. See City of Oklahoma v. Tuttle, 471 U.S. 808, 823 (1985).

Plaintiff has failed to proffer sufficient evidence from which a reasonable fact finder could conclude that a Defendant acted under color of law in a way that intentionally violated, or acquiesced in an intentional violation of, Plaintiff's right to equal protection. See Zelinski v. Pa. State Police, 108 Fed. Appx. 700, 703 (3d Cir. 2004) ("A finding of liability under . . . § 1983 requires that the defendant have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law. Generally, in order to act under the color of state law, the wrongdoer must be in a supervisory position . . .");[42]

---

42. Cf. Bonenberger v. Plymouth Twp., 132 F.3d 20, 23 (3d Cir. 1997) (holding that coworker may have liability where he "wield[s] considerable control over a subordinate whose work he regularly supervises, even if he does not hire, fire, or issue regular evaluations of [claimant's] work").

Boykin v. Bloomsburg Univ. of Pa., 893 F.Supp. 378 (M.D. Pa. 1995) (noting, in granting

summary judgment against African-American employee suspended, placed on leave without pay,

and tried and acquitted on rape charges, that § 1983 action is under color of state law "when

alleged wrongdoer is acting by virtue of his state authority").   Neither Crow nor Quinn, less

senior patrol officers, had any supervisory or other authority over Plaintiff.  Nor did Ferguson, as

Borough manager, exercise supervisory or other authority over Plaintiff.  See Defendants'

BSMSJ at 54-55 (citing relevant Ordinances, Ex. TT).[43] As to Defendants Hockenberry and

Wood, who were his supervisors, Plaintiff has made no showing of any action on their part

toward him plausibly motivated by intentional race-based discrimination/animus and depriving

him of equal protection.[44]  And, as Defendants duly note, to the extent that Plaintiff's pleadings

suggest that his equal protection claims are premised on Individual Defendants' criminal trial

testimony, they are immune from such claim.  See Defendants' BSMSJ at 55-56.[45]

For these reasons, each Defendant is entitled to summary judgment on Plaintiff's claims

under § 1983.  Cf. Egonmwan v. Cook County Sheriff's Dept., 602 F.3d 845 (7th Cir. 2010)

---

43.  Neither Ferguson's designation, as Borough Manager, as an individual who could "receive complaints regarding services" of Borough personnel, and refer them "to the appropriate supervisory personnel", nor any other responsibility/authorization reflected in this Exhibit, placed Ferguson in any position of authority as to Plaintiff.  Compare Plaintiff's Brief in Opposition to Motion for Summary Judgment at 18-19.

44.  Cf. Brown v. Grabowski, 922 F.2d 1097, 1119-20 (3d Cir. 1990) (reasonable jury could not infer intentional discrimination from supervisor's conclusion of insufficient evidence to sustain plaintiff's allegations of sexual harassment against other employee).

45.  Plaintiff's citation to the perjured testimony at issue in Briscoe v. LaHue, 460 U.S. 325 (1983) is flatly inapposite.  See Plaintiff's Brief in Opposition to Motion for Summary Judgment at 20-21.  Moreover, Plaintiff repeats here, as elsewhere in his pleadings, arguments addressed by this Court in its ruling on Defendants' Partial Motion to Dismiss.

(affirming grant of summary judgment regarding terminated African American correctional officer who brought retaliation and gender and race discrimination claims after trial and acquittal on criminal charges of custodial sexual misconduct).

## C.  Claims Under 42 U.S.C. § 1985(3)  and for State Law Conspiracy

Although Plaintiff previously failed to specify whether he was asserting claims under § 1985(2) or 1985(3), and previously declined this Court's express invitation to amend his June, 2008 Complaint to allege conspiracy with specificity of , *e.g.*, dates and time periods, participants, objects, and actions, he has now clarified his §1985 claim as one under § 1985(3). See Plaintiff's Brief in Opposition to Motion for Summary Judgment at 4.[46]   A claim under §1985(3) requires a showing of (1) conspiracy, (2) for the purpose of depriving any person or class of the "equal protection of the laws, or of equal privileges and immunities under the laws", (3) an overt act in furtherance of the conspiracy, (4) whereby the person is injured or so deprived. See Farber v. City of Paterson, 440 F.3d 131, 134 (3d Cir. 2006).   Similarly, a Pennsylvania state law claim for civil conspiracy requires (1) two or more persons acting with a common purpose to do an unlawful act or a lawful act by unlawful means or for an unlawful purpose, (2) an overt act done in pursuance of that common purpose, and (3) actual legal damage.  See, *e.g.*, General Refractories v. Fireman's Fund Ins. Co., 337 F.3d 297, 313 (3d Cir. 2003).  Redress is provided when injury results from private conspiracy driven by "racial or otherwise class-based discriminatory animus."  Griffin v. Breckenridge, 403 U.S. 88, 102 (1971).

---

46.  Cf. Opinion on Partial Motion to Dismiss (indicating that claims under § 1985(2) would require either an underlying Federal (as opposed to State) court proceeding or a showing of class-based, invidiously discriminatory animus motivating conspiracy to impede/obstruct the due course of justice in the State).

Thus, Plaintiff's conspiracy claims require, as an essential element, sufficient evidence from which a fact finder could reasonably infer that the alleged participants had a meeting of the minds/reached an understanding to take actions directed to the common purpose. Plaintiff has, however, proffered neither direct nor circumstantial evidence sufficient to a reasonable finding of conspiratorial agreement or concerted efforts among the Defendants. To the contrary, he proffers conjecture. See, *e.g.*, Plaintiff's Brief in Opposition to Motion for Summary Judgment at 23 (asserting that Defendants' false testimony at Plaintiff's criminal trial creates material fact question that they did so in conspiracy against Plaintiff which was motivated by racial animus).[47] Cf. Boykin v. Bloomsburg Univ. of Pa., 893 F.Supp. 378 (M.D. Pa. 1995) (noting, in granting summary judgment on race discrimination claims of employee tried on rape charges, that "suspicions, speculation and feelings" are insufficient to support conspiracy claim). Nor has he proffered evidence sufficient to a reasonable finding of an underlying tort or constitutional violation.[48] Defendants are, therefore, entitled to summary judgment on these claims.

---

47. Compare Memorandum Opinion and Order on Partial Motion to Dismiss at 4, n. 8 (noting absence of support for allegations of conspiracy, perjury and interference with criminal proceeding).

48. See discussion of Title VII and § 1983 claims, *supra*. See, *e.g.* Moire v. Temple Univ. School of Med., 613 F.Supp. 1360, 1366 (E.D. Pa. 1985) (noting that success of § 1985(3) claim was dependent upon success of underlying § 1983 claim); Knight v. Evanco, 2003 WL 23186012 (E.D. Pa. Dec. 12, 2003) (noting same in granting summary judgment on claims of ten-year veteran police officer who alleged first sexual harassment, then race discrimination, following unpaid suspension related to arrest on drug charges); id. at *9 (also concluding that conspiracy claims would fail as a matter of law where Defendant police officers were "agents of a single entity") (citing Johnson v. Univ. of Pittsburgh, 435 F.Supp. 1328, 1370 (W.D. Pa. 1977)).

### D. **Claim for State Law Defamation**

Finally, as noted in Defendants' Brief in Support of Motion for Summary Judgement, a one-year statute of limitations applies to Plaintiff's defamation action. See Motise v. Parrish 297 Fed. Appx. 149, 152 (3d Cir. 2008) (citing 42 Pa. C.S.A. § 5523). Plaintiff's first civil action was filed June 12, 2008, and that Complaint asserts a claim for defamation premised on statements regarding his criminal arrest. See Complaint at ¶¶ 52, 58, 85, 107. Plaintiff fails to provide evidence of defamatory statements by a Defendant within the statutorily prescribed period. Plaintiff's response conflates the parameters of a hostile work environment claim under Title VII and this State law claim. See Plaintiff's Brief in Opposition to Motion for Summary Judgment at 21. Accordingly, Plaintiff's claim is time-barred.[49]

## V. **FORTHCOMING ORDER**

The Court will, therefore, issue an Order granting Defendants' Motions for Summary Judgment and dismissing the case with prejudice.

Dated: November 1, 2010

_____
LISA PUPO LENIHAN
United States Magistrate Judge

---

49. Defendants additionally observe that the Borough is immune from Plaintiff's defamation claims as presented under Pennsylvania's Political Subdivision Tort Claims Act. See 42 Pa.C.S.A. § 8541, *et seq.* Plaintiff cites no authority for his theory to the contrary. See Plaintiff's Brief in Opposition to Motion for Summary Judgment at 22 n. 8.